## Tipton v. Commonwealth.

(Decided February 3, 1925.)

### Appeal from Anderson Circuit Court.

1. Criminal Law—Statement of Commonwealth's Attorney in Argument to Jury as to General Opinion of Community Held Not Improper in View of Evidence.—In prosecution of mother for murder of son's wife, in which six witnesses had testified for the Commonwealth that mother was opposed to marriage and desired to get rid of the deceased as his wife, statement of Commonwealth's attorney in argument to jury that "it seems to be the general opinion of the community that she (defendant) was opposed to his marriage" held not improper.

2. Homicide—Circumstantial Evidence Held Sufficient for Submission of Case to Jury in Prosecution for Poisoning.—In prosecution of mother for murder of son's wife claimed to have been poisoned by mother, circumstantial evidence held sufficient for submission of case to jury.

3. Homicide—Circumstantial Evidence Held to Sustain Verdict Find-
ing Mother Guilty of Poisoning Son's Wife.—In prosecution of
mother for murder of son's wife, in which it was claimed that
mother had poisoned wife, circumstantial evidence held to sustain
verdict.

4. Criminal Law—Refusal of Instruction as to Presumption of In-
nocence Held Not Error.—In homicide prosecution in which court
gave instruction on reasonable doubt in language of the Code, re-
fusal to instruct that the law presumes every person charged with
crime to be innocent until proven guilty beyond reasonable doubt
held not error.

5. Homicide—Refusal to Instruct on Voluntary Manslaughter Held
Not Error, where it was Claimed that Defendant had Poisoned
Deceased.—In prosecution for murder of daughter-in-law claimed
to have been poisoned by defendant, refusal to instruct on volun-
tary manslaughter held not error.

WILKES H. MORGAN, FRANK L. RIPY, R. F. PEAK, WM. E.
DOWLING and H. W. PHIPPS for appellant.

FRANK E. DAUGHERTY, Attorney General, and CHARLES F.
CREAL, Assistant Attorney General, for appellee.

OPINION OF THE COURT BY COMMISSIONER SANDIDGE—
Affirming.

Appellant, Fannie Tipton, prosecutes this appeal
from the judgment of the Anderson circuit court entered
pursuant to the verdict of a jury which found her guilty
of murder and fixed her punishment at confinement in
the penitentiary for life. The reasons urged in her be-
half for a reversal of that judgment make it necessary to
briefly summarize the facts.

Appellant and her husband lived on a farm in An-
derson county. They had two children, a daughter, who
was married and lived about a quarter of a mile from
them, and a son, Less Tipton, who lived in the home
with them. On August 21, 1923, the son, Less Tipton,
was married to Jessie Thomas Brewer, who had lived for
some time in the vicinity of appellant's home. The young
couple eloped to Jeffersonville, Indiana, and were mar-
ried, returning to Frankfort, Kentucky, the day of their
marriage. The following day they went to the home of
the bride's parents to live. The Anderson county fair
was in session at the time, and the young couple attended
the fair each day throughout the week, returning at night
to her parents' home. Less Tipton, while testifying, as-
signed as one of the reasons for going to his bride's home

to live following the marriage that he thought that his mother would be mad at him for having married. On Monday, following the marriage, Less Tipton returned to his parents' home, as he stated, to procure some of his clothing, and while there it appears from his testimony that his mother and father insisted that he bring his young wife to their home to live, apparently having become reconciled to his marriage. The next day they returned to the home of appellant and from then until September 18th lived there. On the latter date, about six o'clock p. m., the young bride, Jessie Thomas Tipton, died. Appellant was indicted, tried and convicted of having brought about her death by administering poison to her. No witness testified as to the relation of the two women, the one to the other, during the three weeks they lived in the same house, except the appellant, Fannie Tipton, and her son, Less Tipton, who was the surviving husband of the deceased. According to their testimony the two women were congenial and happy together and nothing that was said or done by either indicated any trouble, disagreement or ill-feeling between them. It appears from the record that on Friday, September 14th, only four days prior to decedent's death, the two women went together to a watermelon patch on the farm and pulled two melons. They ate one of the melons in the patch and carried the other home to be eaten later. They appear to have been made sick by eating this melon, and, from the fact that the rind of the melon they ate, as well as that of the one they carried to the house, appeared to have been punctured with some small, round instrument, it was thought possible that the melons had been poisoned. The symptoms of their illness, as described by the two women to a physician whom they consulted, indicated to him that they were suffering from the effects of arsenic poison. The first physician was consulted Sunday afternoon following the illness on Friday, and they appear to have so far recovered that he deemed it unnecessary to treat them for it, but furnished a small vial of ipecac for their use in the future. Less Tipton and his wife alone consulted the first physician. On Monday, September 17th, appellant and deceased together visited the office of a physician in Lawrenceburg and talked with him further about their illness originating the previous Friday and he, from the symptoms as described by them, believing they were suffering from the effects of arsenic poisoning, gave them

an organic compound of iron known as Blaud's Mixture in capsules. While in Lawrenceburg the two women did some shopping and after they and Less Tipton had met at the car and were ready to return home appellant suggested that she had forgotten to purchase some shoe polish. She left the car and went to a drug store and while there purchased not only shoe polish but also a small vial of strychnine in crystal form. Appellant and her son both testified that after leaving town and while on the way home Jessie Tipton asked appellant if she procured rat poison, and that appellant responded that she had obtained some strychnine which they would use for the purpose. The record discloses that Tuesday was spent by the two women in performing household duties common to rural homes, and that the noon meal was partaken of by appellant and her husband and Less Tipton and his wife, it consisting of fried ham and several vegetables, milk and bread. After dinner the men returned to the tobacco field to work, and the testimony of appellant alone discloses what she and deceased did that afternoon. She testified that about two o'clock her daughter-in-law suggested that as they had plenty of milk and a block of ice that had been procured the previous day they make some ice cream, and that the two of them proceeded to do so. After it was frozen it was packed, covered and set aside, and she then went out on the farm somewhere to look after her turkeys; that she returned to the house something near four o'clock, and that her daughter-in-law suggested that they eat some of the cream. According to her testimony the daughter-in-law uncovered the cream and dipped it from the freezer into the saucers and appellant ate only about half a saucer of the cream while deceased ate all of her first saucer and went back to the freezer for a second, but she did not know whether she ate any more or not. She testified that shortly after eating the cream both of them became very sick and that she took a teaspoon of the ipecac and lard and cream to relieve herself. She testified that she tried to get deceased to take the same remedies but that she declined to do so, claiming to be too sick. About four or four-thirty o'clock appellant called loudly to her son-in-law, who was cutting corn in a nearby field, to come to her, that they were sick. The son-in-law hurried over and found appellant in a bed in one room and her daughter-in-law in a bed in another room. He testified that appellant told him when he entered the room in

which she was that they had eaten ice cream and it had made them sick; that she had taken some of the ipecac, and directed him to take it to the young woman sick in the next room and give her a dose of it. He took the medicine into the next room and found Jessie Tipton in bed; he poured a dose of the ipecac into a spoon and suggested that she take it. She said: "Virgie, I can't take it." Those appear to be the only words she spoke to any one. He then undertook to raise her up so as to administer the medicine and, as stated by him, when he attempted to do so she went into a convulsion or spasm. He became very much frightened and left the room immediately and went out on the farm to call the young woman's husband and his father. School children passing at the time appellant called her son-in-law, hearing her cries, spread the news in the neighborhood and shortly a number of neighbors gathered. Their description of the condition of Jessie Tipton makes it appear that she exhibited typical symptoms of poisoning by strychnine. A doctor who reached her bedside a few minutes before she died testified as to the condition in which he found her and, as described by him, it appears that she died a typical death from strychnine poison. The young woman died about six o'clock and within a very short time after the physician arrived. Convinced that Jessie Tipton died from having been poisoned, the suspicion immediately arose that appellant, Fannie Tipton, had administered it. The following day the coroner of the county, assisted by three physicians, performed an autopsy and removed the stomach and duodenum from the dead body. They were carried by the coroner to the state chemist at the University of Kentucky. A chemical analysis of approximately half of the contents of the stomach disclosed the presence of approximately a quarter of a grain of unabsorbed strychnine. Owing to the fact disclosed by the chemist's testimony that he thoroughly mixed the entire contents of the stomach before making the analysis, and his explanation that he analyzed only a portion of the contents of the stomach and held the other in reserve to guard against a possible accident in making the analysis, it is fair to assume and the chemist gave it as his opinion that the analysis of the entire contents of the stomach would have disclosed the presence of approximately a half grain of unabsorbed strychnine. The evidence discloses that a half grain or more is a fatal dose of strychnine for adults. How much of the strychnine

had been absorbed by deceased's system prior to her death does not and could not appear. That, of course, would depend upon the amount taken and the length of time elapsing before death. In addition to the proof that appellant had purchased the vial of strychnine in crystals form on Monday, September 17th, the day before Jessie Tipton died, the Commonwealth also proved that on September 7th, she purchased an ounce of arsenic from one of the drug stores in Lawrenceburg. The Comommonwealth proved by Mrs. Tom Proctor that at the fair grounds during the Lawrenceburg fair and after the marriage of Less Tipton to Jessie Brewer, appellant said to her that her son was married and she didn't like the woman; that she never would like her; that Less had a home and had better have made the best of it; that it was all he would ever get and that she didn't want him or her about her now or ever. May Cook testified that about ten days or two weeks before the marriage appellant said to her at the front gate at her (witness') home on the pike, referring to her son and Jessie Brewer, that if they married it would be the "sorrowfulest wedding" that was ever known and that if she ever stepped her foot on their land she would be a dead woman. Mrs. Lorena Hammond testified to practically the same statement which she says appellant made to her at Mt. Vernon church on Sunday about two weeks before the wedding. Albert Lewis testified that at the home of appellant on the day before Less Tipton and his wife went there to live, in talking about the wedding of her son and Jessie Brewer, appellant said to him that they were married but wouldn't live together long. Walter Perry stated that one night about two weeks before the wedding he passed along the pike in front of appellant's home and found her and her husband waiting on the roadside. Appellant told him of a controversy she and her son Less had had that night about his using the automobile and said that she was up there looking for them to come home and if they should come by that way she was going to make the girl get out and walk home. He stated she further said that she could take $50.00 and beat the Brewers in court any time; that they didn't have ten cents to their name. Cody Moffatt testified for the Commonwealth that during the Lawrenceburg fair and after the marriage of Less Tipton and Jessie Brewer, he had a conversation with appellant in her orchard in which, in speaking of her son's marriage and his wife, she said:

"If she puts her foot inside of my house I will kill her; if I don't kill her one way I will another."

Appellant testified for herself that after her daughter-in-law moved into the house with her they grew to be very fond of each other; that they worked together and had no trouble or difficulty of any kind. She denied having administered poison to her daughter-in-law and claimed to have gotten sick at the same time and in the same manner that she did. She testified that she purchased the arsenic to poison rats and that all of it was used for that purpose. Also that she purchased the strychnine for the same purpose but had not had time to use it and that the bottle of strychnine had not been opened. The physician who was present when Jessie Tipton died examined appellant the same night, and he testified that she was perspiring profusely; that her pulse and respiration were normal; that her eyes showed no dilatation of the pupils and that she claimed to have been vomiting. He testified that she had no symptoms of strychnine poisoning. It is in evidence that from her bed shortly after the death of Jessie Tipton she gave directions as to the preparation of the evening meal and for breakfast for the following morning. To most of the neighbors who first reached their home appellant stated that she and Jessie Tipton had been poisoned. The bottle of strychnine purchased by appellant the day before Jessie Tipton died was found at the home and produced at the trial. The druggist who sold it identified it as being just like the one he sold appellant. It appears from the testimony that there is a metal covering over the cork of these bottles and from the testimony of the druggist it appears that it would be difficult to remove the metal covering in such a way that it could be replaced again. The metal covering was still on the bottle of strychnine found at appellant's home. A similar bottle was purchased by counsel for appellant from the druggist and it together with the bottle found at appellant's home were introduced in evidence that the jury might determine from an examination of the bottles as to whether or not the one found in appellant's home had been opened. Appellant denied each and every one of the statements made by the witnesses as to threats or quasi threats made by her against deceased, and all the testimony tending to establish that she was opposed to the marriage. Under the foregoing state of facts the jury found appellant guilty. It is insisted for her that the judgment entered in conformity

with the verdict should be reversed for the reasons here-inafter discussed.

In the concluding argument the Commonwealth's attorney used this language: "It seems to be the general opinion of the community that she was opposed to his marriage." An objection was made at the time which the trial court overruled. It is insisted for appellant that the language quoted was exceedingly prejudicial to her rights; that the evidence against her was altogether circumstantial; that a very strong public sentiment against her existed; that any attempt upon the part of the Commonwealth to bring to the knowledge of the jury the state of public sentiment was exceedingly prejudicial; and that the language of the Commonwealth's attorney quoted above directly called the jury's attention to it. The Commonwealth had established as appellant's motive for killing Jessie Tipton by the testimony of six witnesses that she was opposed to her marriage to her son and desired to get rid of her as her son's wife. In view of the proof offered in evidence, the attorney for the Commonwealth might properly have said to the jury: "We have proved by her neighbors that she was opposed to the marriage." That statement it seems to the court would have been much stronger than was the statement used by the Commonwealth's attorney in the language quoted. While the language quoted was perhaps inapt to express what was intended to be said, it does not seem to the court that it tended to invite the jury's attention to the state of public sentiment hostile to appellant as is contended by her, or that the use of the language was improper under the proof in the case.

It is insisted for appellant that the trial court erred in refusing a peremptory instruction for her acquittal at the close of the Commonwealth's testimony and that the verdict of the jury is flagrantly against the weight of the evidence. In that connection the following is quoted from Wharton on Homicide, third edition, page 156, as being a principle of law applicable to this case:

"In poisoning cases the charge is not sustained unless the prosecution negatives everything but poison as the cause of death, and this can only be done by showing affirmatively that the combined symptoms and certain facts with which they are associated are inconsistent with any other ailment."

It is the theory that Jessie Tipton's death may have resulted from ptomaine poison present in the ice cream eaten by her shortly before she became sick. We find, however, that that theory is completely exploded by the evidence in this case. At the same time the stomach of Jessie Tipton was taken to the chemist for analysis a sample of the ice cream which they had eaten was also taken to him. No poison was found in it and a portion of it was administered to a guinea pig without any evidence or symptoms of ptomaine or other toxic poison. The chemist who made the chemical analysis of the contents of deceased's stomach testified that the substance found by him which he identified as strychnine could not have been produced by ptomaine poison. The symptoms exhibited by Jessie Tipton before her death, as described by those who saw her, were typical of strychnine poison and not of poison from ptomaine. The chemical analysis of her stomach disclosed the presence of approximately a half grain of unabsorbed strychnine. She lived something like an hour and a half from the time the first witness, aside from appellant, got to her, during which time it was known that she took no strychnine. How much of that taken by her had been absorbed we canont tell. Under this state of case, it seems to the court that the prosecution has negatived everything but strychnine poison as the cause of death. Appellant invokes another rule to which this court adheres, quoting from Chambers v. Commonwealth, 200 Ky. 296:

"The rule that a conviction in a criminal case may be had upon circumstantial evidence alone is subject to the qualification that if the evidence be as consistent with defendant's innocence as with his guilt it is insufficient to support a conviction. Mullins v. Commonwealth, 196 Ky. 687, 245 S. W. 285, and cases cited. The same rule is stated in different form in 8 R. C. L., section 222, and 16 C. J., section 1568."

Appellant insists that all the proof against her is circumstantial and that all the circumstances may as reasonably be reconciled with her innocence as with her guilt. It is vigorously insisted for appellant that the facts and circumstances proved against her are not so strong or at least no stronger than were the facts and circumstances of the case of Wilkerson v. Commonwealth, reported in 25 Ky. L. R. 780. In that case appellant was

convicted of having poisoned his wife by administering strychnine to her. In that case, as in this, a chemical analysis of decedent's stomach disclosed the presence of strychnine in fatal quantity and the evidence was convincing that she came to her death by poisoning and that strychnine was the agent. It was shown that some three weeks before her death appellant attempted, though unsuccessfully, to purchase strychnine from a druggist. This court held that the facts proved by the Commonwealth as tending to establish a motive for appellant to poison his wife did not have such tendency. The Commonwealth attempted to prove that Wilkerson had become enamored of another woman and desired to rid himself of his wife. This court held that the circumstances proved did not tend to establish that fact. Further, it was proved in that case that decedent in a conversation with some two or three of her neighbors had talked in such a way as to indicate that she was tired of life and was contemplating suicide. It was proved by one witness that she had stated that she had strychnine concealed in a pocket in her underskirt which no one knew about. An examination of her underclothing after death disclosed that she had a pocket in her underskirt, though no strychnine was found in it. Nothing that Wilkerson ever said was proved which tended to establish that he desired to rid himself of his wife. So that in that case the only facts proved were that the wife died from strychnine poison and that Wilkerson, her husband, at home alone with her at night, had the opportunity to administer it to her. The court held that the evidence introduced for the Commonwealth to establish a motive did not have a tendency to do so. For lack of a motive and due to proof that deceased had told her neighbors that she was tired of life and had in effect threatened to kill herself and that she possessed strychnine with which to do so, this court properly held that all the facts proved were as readily reconcilable with Wilkerson's innocence as with his guilt, and directed that he be acquitted. The case against this appellant is much stronger. Appellant's motive to kill her daughter-in-law and her threats to do so have been proved unmistakably. Beyond question Jessie Tipton died from strychnine poison. There is no evidence or suggestion in the record that she had any reason or desire to take her own life. The illness of the two women and the likelihood that it resulted from arsenic poison on Friday before decedent died the fol-

lowing Tuesday is a suspicious circumstance. It is contended for appellant that the only way she is shown to have had the opportunity to administer the poison was in the ice cream eaten by Jessie Tipton shortly before her death, and that she could not possibly have done so in that way because the extreme bitterness of the drug would have given notice of its presence at the first taste. The ice cream, however, was tested and it was found to contain no poison. It must be remembered that the testimony as to what was done by appellant and deceased before her fatal illness can be had now only from the lips of appellant. The evidence disclosed that capsules containing the medicine furnished by the physician Monday afternoon were in the house. Appellant had every opportunity to load one of those capsules with a deadly dose of the strychnine possessed by her. She had the opportunity, following the eating of the ice cream, to feign illness herself and to suggest that they had been poisoned again as on the previous Friday. She had the opportunity then to administer to decedent one of the capsules furnished by the physician for such a contingency, which she had loaded with strychnine, without her suspecting what she was taking or being warned by the bitter taste that she was taking a deadly poison. In contradicting the six witnesses whose testimony is noted above as to her threats against decedent, appellant admitted that she saw and conversed with the witnesses at the time and place mentioned, in each instance, but she denied positively and absolutely all of their testimony which tended to show that she had been opposed to her son's marriage or had threatened the life of his wife. It is inconceivable that all of those people were swearing falsely in this case. So that in the case now in hand we have appellant's motive to kill decedent established; we have in evidence her threats to do so; we have conclusive evidence that decedent died from strychnine poison; that appellant had in her possession a quantity of that deadly drug; that she had capsules within which the deadly poison could be enclosed to hide its bitter taste and deadly qualities; and we have appellant proved to have had every opportunity to administer the deadly drug to her victim. There is no proof that this young woman, a bride of only a month, had any desire to take her own life. If this state of facts will not support a verdict of guilty, then it seems to the court it would be

impossible ever to convict one of murder committed by administering poison, and the court can not hold with appellant's contention that the trial court erred in not peremptorily instructing the jury to find for her or that the verdict is flagrantly against the evidence.

Appellant insists that the reasonable doubt instruction given by the trial court was erroneous and that in lieu of the one given the court should have given the instruction offered by her. However, we find that the instruction given follows the language of the Code and that the refusal of the instruction offered, which recited that the law presumes every person charged with the commission of a crime to be innocent until proven guilty beyond a reasonable doubt, etc., has been many times held by this court to be proper, and we have been cited no case holding that a refusal to give the instruction offered is erroneous.

It is insisted that the trial court should have given an instruction on voluntary manslaughter. There is no evidence in the record upon which such an instruction could have been founded. Appellant either did or did not administer strychnine to her daughter-in-law. If she did so under the circumstances tending to establish that she did proved for the Commonwealth she was guilty of murder. If she did not administer the strychnine to her daughter-in-law as she contended, she was not guilty of anything. So the trial court properly gave only two instructions, one advising the jury in what state of case it might find her guilty of murder, and the other advising the jury in what state of case they might acquit her. The murder instruction given is not criticised and is free of error.

Upon the whole case we find from the record that appellant's trial was as free of error as well could be. A jury tried her and from the evidence found her guilty. The evidence amply supports the verdict found by the jury. There having been committed no errors prejudicial to appellant's substantial rights, the judgment rendered upon the verdict of the jury must stand.

The judgment is affirmed. The whole court sitting.