# Cassell v. Commonwealth.

(Decided April 18, 1933.)

WAUGH & HOWERTON and W. T. CAIN for appellant.

BAILEY P. WOOTTON, Attorney General, and FRANCIS M. BURKE, Assistant Attorney General, for appellee.

· OPINION OF THE COURT BY STANLEY, COMMISSIONER— Affirming.

The appeal is from a judgment declaring the appellant, Zona Cassell, guilty of murdering his wife by poison and sentencing him to life imprisonment. The Bill of Rights vouchsafes to every person accused of crime the right to a fair trial—by an impartial jury of the vicinage if possible, but a fair trial in all events. The appellant claims that this inalienable right was not accorded him. He rests his appeal upon that constitutional provision (section 11), and insists upon his innocence.

In considering the grounds urged for a reversal, we shall not discuss the points in the sequence of their development on the trial, but first consider the claim that the verdict is flagrantly against the evidence, as that must present fully the facts of the case.

The family lived in the Georges Creek section of Lawrence county. The defendant was 55 years and his

wife about 50 years old. They had been married 29 years, and had lived together peaceably and affectionately. A married son lived about 150 yards from their home. A younger son had died about 4 years before.

The evidence of guilt produced by the commonwealth is that the neighbors heard Cassell calling as in distress at his home about nine o'clock on the night of October 26, 1932, and when they went there they found Mrs. Cassell on the bed in convulsions. Their son Luther had come, and his father told him to go for a doctor, but before he could get away Mrs. Cassell died. According to the neighbors, during this brief period she was apparently unconscious and made no statement. It seems that her body was not embalmed, and the next morning there was what was thought to be a swelling of her stomach, but which was apparently the "arching" of the body due to the contraction of the muscles caused by strychnine poison. When it was suggested then that her stomach should be pumped out, the husband stated he did not want that done and would rather bury her that afternoon. About two weeks after her burial an analysis of the viscera revealed that she had died of strychnine poison. About a month before this the defendant had purchased some strychnine, but there was no effort at concealment, as he had properly signed the druggist's register showing its purchase. That night the accused appeared to be sorrowful. In relating what occurred he stated that after supper he and his wife had listened to the radio until bedtime, and that she had complained of feeling bad, and said she would go to the kitchen and eat a bite and see if she would not feel better. She returned to the room, and in response to an inquiry said that she felt no better, and then said she would get herself some medicine. He also said after she had gone to bed she had gotten up and fixed herself some medicine; but did not tell the witness what it was. But another person testified he said he had given her some soda water and that in a few minutes "she was gone." This he denied. Just before the trial the accused told a witness that his wife had told him and his son that she had taken the poison herself, and asked that they say nothing about it, but he had made a mistake in not doing so sooner. The proof is that during the afternoon before her death the woman had been in good health and happy spirits.

About a year before, May Borders, a niece of Mrs. Cassell, came to live in the home. She was about twenty years old. That she bore a bad moral reputation is not denied. She had been gone from there about a week or so when Mrs. Cassell died. A witness related that at Mrs. Cassell's instance he had talked with the appellant about having bought a dress for the Borders girl, and he then said that his wife was jealous of May; that he had bought a dress for her as the young ladies shunned her because she was not dressed like they were; that perhaps he should not have done so, but had thought no more about buying the girl a dress than he would one for his sister, and had paid only $6.50 for it.

May Borders testified that her aunt had said to her that there was a lot of talk about her uncle and herself, and asked that she go to her grandmother's home and stay awhile and see if the talk would not die down and then to return. She testified that there had been improper relations between the accused and herself, and that at that time she was pregnant by him. About ten days after the death of his wife, the accused and the girl went to Lexington, where they lived together for about two weeks, when they were arrested on the charge of murder. She stated that both before and after the death of his wife the defendant had asked her to marry him, and that while in prison he had written her a note asking if she would marry him when they got out.

The defendant denied the accusations. He testified that his wife's health had not been good for several years, and that after the death of their son she had worried a great deal, was despondent at times, and said she had rather be dead than alive. Upon several occasions she had asked him to get some strychnine to kill mice and rats with which they were bothered, but he had not done so until about a month before her death when she and their son were in town and she had him stop and get it. Some of it was given to his brother and his son, and his wife took possession of the remainder, which he never saw afterward. On the evening of her death she complained of pains in her stomach, which she attributed to some greens eaten at supper. She went to the kitchen for a few minutes, and upon returning got in bed, leaving the light burning. We quote directly from his evidence:

"She laid there something like ten or fifteen seconds and raised up in the bed right quick and it frightened me and I raised up and I says: 'Tishia (Witness stopped talking and cried) what is the matter?' She laid her head over on my shoulder —put her arms around me—and said: 'Zona, I have taken that poison.' (Witness cried again.) I said: 'Tishia, you didn't do that did you?'—and she said: 'Yes.'—And I says: 'Why did you do that?'—and she said: 'Zona, please don't tell it.'— I jumped out of the bed as quick as I could and run in the kitchen and got a spoonful of lard and brought it back and said: 'Tishia, take this; it might kill that.' And she said: 'Zona, I won't take it.' I run out on the porch and hollowed for my boy two or three times and he got there I guess in something like half a minute or a minute after he answered me."

The defendant denied having said he had given his wife soda water. He had kept his story as to her poisoning herself a secret out of respect for his wife's wishes. The Borders girl, he testified, had been taken into their home at his wife's instance, and had been treated as a member of the family. His wife never said a word to him about their relations, except that upon one occasion, eight or nine months before, she thought he had paid too much for the dress he had bought her. He admitted he had been intimate with the girl, but says it was at her solicitation. He denied ever having asked her to marry him, but admitted having lived with her in Lexington. The accused's son and daughter-in-law testified that Mrs. Cassell was bothered with rats in her home, and had several times said she wanted to get some poison for them. On the occasion when the strychnine was purchased the daughter-in-law got some bread and her husband and father-in-law put some of the poison on it and it was placed in both of their homes. These witnesses testified also as to Mrs. Cassell's ill health and melancholia and as to the defendant calling excitedly for help on the night of her death. They had run over there quickly. Mrs. Cassell was unconscious at the time, and her son testified that he asked her what was the matter and she said, "Luther, I have taken poison;" and further, "Do not say anything about it;" and he promised her he would not. They had heard of rumors about the rela-

tions of the accused and the Borders girl and stated that their mother had also heard of them, but had said nothing about it. There were also rumors at the time about her relations with some of her cousins. There is some evidence of contradictory statements made by these two witnesses, such as that the wife had left her husband and declared she would not go back to him; that the defendant had said he was dissatisfied with his wife and was going to leave her; that there was no strychnine in the house; and that they were afraid of the defendant. The witnesses denied making such statements. There is other testimony as to the deceased's ill health and nervous condition, as well as to her despondent spells. Within a short time of her death she had said to her husband's brother that she would rather be dead than alive; that her husband was good to her, but ''Sometimes I think I will end it all; I don't want to stay here.'' It was related that in the latter part of their lives the minds of the deceased's mother and grandmother ''went bad.'' The defendant proved that before this accusation he had always borne a good reputation. He seems to have been a man of standing in his community.

Conceding that there are inculpatory circumstances tending to prove guilt which if unexplained were sufficient to authorize the verdict, it is submitted that explained, as they were, the evidence altogether is not sufficient to sustain the verdict, and that the case is brought within the line of opinions holding that, if the circumstances are consistent with any other reasonable hypothesis than that the defendant was guilty of the crime charged, the conviction will be set aside. What is the proof and what are the reasonable deductions sufficient to form a rational basis for the belief beyond a reasonable doubt that a crime was committed and that the accused is guilty of it?

(a) It is true that up to the time of this accusation the defendant had borne an excellent reputation. Substantive evidence of that kind accentuates the presumption of innocence and nothing more. But a weakness in this man's moral fiber is disclosed by the admitted adulterous relations with his wife's niece. Thus his character stands revealed. So that factor is removed from our consideration.

(b) There existed the strongest kind of motive to

get rid of his wife—one which constitutes a prolific source of atrocious crime. Motive is a principal, though psychological, fact. Indeed, it is the manifest source and spring of all criminal action, and may justly claim to rank at the head of positively criminative circumstances. Burrill on Circumstantial Evidence, 282, 313. Insufficient in itself to prove guilt, its presence is always an important consideration, and in poisoning prosecutions dependent upon circumstantial evidence for conviction, when coupled with possession of the poisonous substance or deadly agency used, or its availability and opportunity to administer it is shown, motive may be decisive, although by no means conclusive. Roberson's Criminal Law, sec. 510; Childers v. Commonwealth, 161 Ky. 440, 171 S. W. 149; Bates v. Commonwealth, 189 Ky. 727, 225 S. W. 1085; Blankenship v. Commonwealth, 228 Ky. 830, 16 S. W. (2d) 478; Wills' Circumstantial Evidence, 219; Zoldoske v. State, 82 Wis. 580, 52 N. W. 778; State v. Hyde, 234 Mo. 241, 136 S. W. 316, Ann. Cas. 1912D, 191. A vigorous incentive being conclusively established, the serious question in this case is whether it reaped a criminal act— whether a vicious motive became an atrocious deed.

(c) It was not long before the girl had been asked to leave the home that the defendant purchased a large quantity of strychnine. It is true there was no effort to conceal its purchase, and the defendant and his son testify that it was bought at his wife's instance and when she was present for the purpose of killing rats. She is silent in death and there is no contradiction. The parties were alone that night. So there were available the substance and the opportunity for its use—essential elements or links in a chain of circumstances. He then possessed the power to execute safely, as he doubtless believed, the nefarious design which criminology teaches so often follows the existence of the motive we have considered. The criminality of the act is the same whether he administered the poison or put it in her way to take innocently. Roberson's Kentucky Criminal Law, sec. 426.

(d) While most of the actions of the accused on the night his wife died are consistent with innocence, yet it is very significant that he not only kept to himself then—as did the son—the fact as they testified upon the trial that the dying woman had just told them

she had taken poison. He did not that night or at any other time undertake to say or even to discover what the medicine was that he told the neighbors she had taken to alleviate her indigestion. To others he related slightly different circumstances, such as that he had given her soda water.

(e) Another significant fact is that the next day he opposed the suggestion that the dead woman's stomach should be pumped out, and suggested that she be buried at once.

(f) It was only after the accused had gone away to live with the girl and a post mortem made that the cause of the woman's death became known. The defendant had gone through an examining trial, and during the three intervening months had rested under this serious charge, with his life at stake, yet up to the time of his trial both he and his son had kept within their bosoms the confession of suicide. The claimed respect for his wife's wishes as the reason for its suppression is in strange contrast with the disregard he had for her in his infidelity and his admitted enamorment of her niece.

(g) Another criminatory circumstance is his subsequent indecent demeanor and disregard for the memory of his faithful wife of so many years. His haste in leaving the county with his inamorata is not at all consistent with the defendant's story. It is a badge of guilt commonly found in the reported cases.

Guilt might be well doubted if there were only one or two circumstances indicating it; but not so where they are numerous and one added to the other multiplies in geometrical ratio the probability of guilt. Over against all those circumstances is slight and unsatisfactory evidence tending to show reasons for her suicide, consisting of statements that she was despondent since the death of her son four years before, and of two or three isolated remarks of a nervous woman that she would as soon be dead as alive, and testimony that her health was not good. Counterpoised to this, however, is evidence of her cheerfulness, particularly on the afternoon of her death, and of her labor and activity about her own household and that of her son.

In Burrill on Circumstantial Evidence (a standard authority since 1856), it is said (page 720) that the dif-

ficulty of determining whether the poisoning has been the result of suicide or homicide requires resort almost exclusively to evidence of what is termed "moral considerations," such as the previous state of mind of the deceased, his situation and circumstances, his manner and conduct during the illness produced by the poison, and his relation to others who may have an interest in his death. In criminal charges it is pointed out that it is rarely possible to obtain proof of a corpus delicti without resorting to the same kind of evidence of moral conduct and circumstances on the part of the person who is charged with the crime, such as previous allusions to the death of the deceased as an event likely to happen, the possession of a poison similar to that proved to have been taken, or of the means of preparing such a poison, and acts of suppression or destruction of evidence after the death had occurred. We have presented in this record all of the enumerated moral considerations save one, and much more.

Looking to our cases for precedents and authority, we have many holding that circumstantial evidence alone, if within the rule excluding every other hypothesis, is enough to support a verdict of guilty of the most atrocious crime. Smith v. Commonwealth, 140 Ky. 599, 131 S. W. 499; Dorsey v. Commonwealth, 158 Ky. 447, 165 S. W. 405; Taylor v. Commonwealth, 182 Ky. 728, 207 S. W. 456.

With confidence appellant relies upon Denham v. Commonwealth, 239 Ky. 771, 40 S. W. (2d) 384. In that case a father was convicted of murdering the newly born illegitimate child of his daughter, and the judgment was reversed as being flagrantly against the evidence. The only criminative circumstances against the accused were that he had concealed the birth, death, and burial of the child, together with some claim that he was guilty of having debauched his daughter. The cases are different in a material respect. Although motive and opportunity were amply proven, there was no evidence contradicting proof that the baby had died a natural death. Here the deceased was admittedly poisoned and died a violent death. The only questions on this trial were whether it was suicide or murder committed by the defendant.

There are two other cases like the instant one in

which it was held that the evidence was not sufficient to support the verdict.

In Abbott v. Commonwealth, 42 S. W. 344, 19 Ky. Law Rep. 946, a wife died of strychnine poison, and the husband was convicted of her murder. He was enamored of a young girl living in the home, and left with her the night of his wife's burial, which he did not attend. Strychnine had been recently purchased for the purpose of killing crows. That evidence was held insufficient, however, to sustain the verdict, since it was clearly shown that the deceased had taken the poison with suicidal intent—an element or factor by no means satisfactorily shown in the case at bar.

In Wilkerson v. Commonwealth, 76 S. W. 359, 25 Ky. Law Rep. 780, another uxorcide poisoning case, there was an absence of motive and some proof that the deceased had threatened to kill herself. The evidence was held insufficient, although the accused was alone with his wife and had an opportunity to administer the strychnine.

We turn to two cases in which the chain of circumstances was as complete as that which binds this appellant to the crime of killing his wife.

In Levering v. Commonwealth, 132 Ky. 666, 117 S. W. 253, 136 Am. St. Rep. 192, 19 Ann. Cas. 140, the deceased died of strychnine poison, and there was evidence to support the theory of the accused husband that she had taken it with suicidal intent. As here, there was another woman in the case, and she likewise testified against the defendant. The conviction resting upon circumstantial evidence against the defendant's denial was sustained, although the evidence was stronger than that adduced in this case.

In Tipton v. Commonwealth, 207 Ky. 101, 268 S. W. 789, a woman was convicted of poisoning her daughter-in-law. The evidence of guilt was hardly as satisfactory as that presented in this record, for a rather weak motive was established. But coupled with it was evidence of the death by strychnine, possession of that drug by the accused, and an opportunity to administer it, some threats, and an absence of a substantial motive to suicide.

Weighing all the evidence and inferences, a jury

has determined that beyond a reasonable doubt this was a murder and that the defendant is guilty of it. On this point the question before us is only whether that verdict is flagrantly contrary to the evidence. After a full consideration of the record, we cannot say that it can be so regarded.

The case was called for trial January 23, 1933. The petition for a change of venue sets out that the defendant's wife had died of strychnine poison on October 26, 1932; that the defendant had an examining trial on November 23d, at which evidence tending to establish his guilt of her murder was introduced before a packed courtroom, and that there were many in town who could not gain admittance; that the evidence, together with certain inflammatory false stories, were disseminated throughout the county and had inflamed the people against him; that the prosecution had been instigated and pursued by members of his wife's family, which is an old and influential one in Lawrence county, and they had circulated false and exaggerated stories concerning the evidence; that the parents of the Borders girl had filed a civil suit against him for debauching their daughter; that the local newspaper had published this suit and the evidence heard on the examining trial; and that by reason of all of these things no jury could be secured in the county that would give the defendant a fair trial. The material allegations were denied by the commonwealth, and it was affirmatively alleged that there was no prejudice against the defendant and that he could secure a fair trial in the county. By affidavit and oral testimony only ten representative citizens were heard on each side under the limitation of the court. Of course, the consideration is not that of numbering witnesses, but is of weighing the evidence. All the witnesses stated they were acquainted with the conditions in the county and the attitude of the citizens toward the crime and the defendant. Putting the evidence of each group in juxtaposition, the only material difference is that ten are negative and ten are affirmative in respect to the matter in issue; namely, whether in their opinion a fair and impartial jury could be obtained in the county. There was no proof of any hostility toward the accused. The question before the public was whether he was guilty or innocent. The accused was a substantial citizen of the county for many years, and doubtless had many friends who believed in his inno-

cence. This is not like some of the cases we have had in which there was a popular clamor for a victim, or for the person charged with the crime, whether he be guilty or innocent, or where there was race prejudice and hostility. Such crimes as that charged to the defendant, being of a mysterious, sensational, and heinous nature, excite public interest, especially in the country, and examining trials usually attract curious crowds. There is a material difference in the estimates of the size of the crowd present on the examining trial, but no witness testified to any conduct on its part indicating hostility. The verdict reflects no prejudgment or prejudice. There could have been but one of three conclusions: acquittal, life imprisonment, or death. We find the evidence justifies the conclusion of guilt, and the jury fixed the lesser of the two penalties it was within its power to inflict. If the trial court had overruled the motion for a change of venue on the evidence introduced by the defendant alone, a careful analysis of it makes it doubtful if it could be regarded as such an abuse of discretion as would justify a reversal of the judgment on that ground. With the countervailing evidence, it cannot be said that there was an abuse of discretion in his ruling. Mansfield v. Commonwealth, 163 Ky. 488, 174 S. W. 16; Bryant v. Commonwealth, 202 Ky. 427, 259 S. W. 1038; Vaughn v. Commonwealth, 204 Ky. 229, 263 S. W. 752; Hall v. Commonwealth, 207 Ky. 718, 270 S. W. 5; Holmes v. Commonwealth, 241 Ky. 573, 44 S. W. (2d) 592; Hannah v. Commonwealth, 242 Ky. 220, 46 S. W. (2d) 121.

The motion for a continuance was supported by the plea that the defendant's chief counsel was so ill that he could not do justice to himself or his client in the trial of the case; that during the intervening fifteen days since the return of the indictment his attorneys had been engaged in the trial of other cases and had not had sufficient time to consult and prepare the case for trial; that by the next term of court the public sentiment against him would subside; and on account of the absence of a material witness. The commonwealth closed the presentation of the case one afternoon about five o'clock. The defendant objected to a night session of court, and filed a motion and affidavits for an adjournment until morning. The basis of this was that the defendant and his counsel both were sick and unable to go into a night session and unable to do their case jus-

tice; and also that many of the jury had expressed themselves as being tired and worn out and were protesting against it. It was also stated the defendant's witnesses had gone home in ignorance of the reconvening of court.

The deposition of the absent witness was admitted. We have already disposed of the point as to public sentiment. It had been nearly three months since the defendant was arrested and charged with the crime. There was, therefore, ample opportunity for preparation for trial. A sympathetic consideration for counsel would seem to have demanded that the case be passed in the first instance until another day, and in the second instance until morning. Every experienced practitioner realizes the enervating effect of several days of strenuous courtroom labor. Coupled with such an indisposition as that disclosed by counsel and the defendant, a night session of court becomes a heavy burden. The tension and responsibility of stating a defendant's case and putting him upon his own examination under such circumstances require the best there is in an attorney, and ought to be undertaken when his faculties are at the best. It is hardly fair to force a night session in circumstances such as here disclosed. We are, however, called upon to determine only whether the action of the court in overruling these two motions, or either of them, was prejudicial to the substantial rights of the appellant. Counsel participated actively with his associate in the trial, and the record reflects no harm whatsoever to the presentation of the defendant's cause. He was defended with resourcefulness and unusual ability. The absence of his witnesses that night made no difference, for none were needed. We conclude, therefore, that these grounds for reversal must be denied.

Finally, we come to the claim that the appellant was and is entitled to a new trial because of the bias and prejudgment of one of the jurors, under sections 209 and 271, Criminal Code of Practice. The affidavits of Hanes, Fitzgerald, and Frazier stated that, after the examining trial of the defendant, Frank Rister, one of the jurors, who had been summoned as a bystander, cursed the defendant and said he ought to be hung. Mrs. Martha Hays deposed that at another time and place, which seems to have been while veniremen were being summoned for this trial, Rister said in her pres-

ence that if he got on the jury he would "stick him." Rister had, of course, qualified for service upon his voir dire. By his affidavit he denied having made the statements attributed to him. Oral testimony was heard upon the motion. The three men were unshaken in their charges. Their reputations were attacked and sustained. It appears that the principal basis of their bad reputation was that they would get drunk. Rister also testified in emphatic denial of the charges; and, while his reputation was not questioned, he admitted to having recently been fined for being publicly drunk. So in the matter of reputation there seems to be a set-off. Mrs. Hays refused to obey a subpœna served upon her to attend this hearing because, as she told the officer, she had been told if she signed the affidavit she would not have to go to the courthouse. It appears that she left town that day. Whether her action was due to reticence or fear of examination is conjectural. The circumstances under which the defendant learned after the trial of this alleged bias were also presented to the court. He heard and saw these witnesses, and, taking the whole matter into consideration, reached the conclusion that the evidence was not sufficient to set aside the verdict, relying, as stated in his opinion, upon the rule that verdicts should not be lightly set aside upon such ground, as is stated in Gleason v. Commonwealth, 145 Ky. 128, 140 S. W. 63, Ann. Cas. 1913B, 757; Mansfield v. Commonwealth, supra. We are not convinced that his action was error.

The nature of the case and the character of evidence upon which the conviction of this man was had have called for an unusually careful examination of the record. Upon such a consideration of the whole case, we are of the opinion that the defendant had a fair trial, and that the judgment should be, and it is, affirmed.