Lee GRAVES, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

Court of Appeals of Kentucky.

Dec. 3, 1954.

L. S. Rogers, Franklin, for appellant.

J. D. Buckman, Jr., Atty. Gen., William F. Simpson, Asst. Atty. Gen., for appellee.

COMBS, Justice.

Lee Graves has appealed from a judgment sentencing him to twelve months in jail for involuntary manslaughter in connection with the death of Mrs. Roy Brown.

At about 8:30 p. m. on the evening of January 17, 1953, Graves was driving a pickup truck through a rural section of Simpson County. He was accompanied by one Freeman and a young lady by the name of Ann Sickles. Near the home of Roy Brown, the truck ran into a ditch and the occupants were unable to extricate it. Suel, the son of Mr. and Mrs. Brown, heard the commotion made by the truck or its occupants and went to investigate. Mr. Brown had already retired for the night. Mrs. Brown, upon learning that one of the occupants of the truck was a girl, suggested to her son, Suel, that he invite her into the house. Graves and Freeman, though not invited, came into the house with the girl. There is testimony that the three of them were intoxicated and that Graves in particular was "awfully drunk." Freeman inquired of Mrs. Brown about a tractor with which to pull the truck out of the ditch, and upon learning that the Brown tractor was not available he requested Mrs. Brown to call by telephone a boy by the name of Johnson. While Mrs. Brown was using the telephone, the defendant Graves staggered around the room and later asked Suel if he had a call in for him. The boy replied, "I don't know what you are talking about," to which Graves responded, "If you don't know tonight you will know before morning."

Mrs. Brown succeeded in getting the Johnson boy on the line. She then handed the telephone to Freeman. Graves took the instrument from Freeman, saying, "God damn it, give me the telephone."

Freeman requested Suel to get a pair of wire pliers for him in order that he might cut the fence in which the truck was entangled. Suel went into another part of the house and soon returned with a pair of tin snips. Mrs. Brown then left the room and went into the bedroom where her husband, who had been disturbed by the loud talking, had got out of bed and was in the act of dressing. Mrs. Brown said to her husband, "They just tore me all to pieces. I am going to have to have a doctor." Mr. Brown then went into the front room and ordered the visitors to leave, telling them that his wife was sick and he intended to call a doctor. The visitors did leave and Brown returned to the bedroom where he found his wife nauseated and in a weakened condition.

The defendant Graves was soon back at the house, pounding on the front door and demanding admittance. Not being admitted, he then kicked on the side of the house and rapped on the window of the bedroom to which Mrs. Brown had retired. Within a short time, Mrs. Brown lapsed into unconsciousness and died three days later from the effects of a cerebral hemorrhage. She was 43 years old and had suffered from hypertension for some ten or twelve years.

Dr. Moore, who attended Mrs. Brown on the night she became ill, testified that he had previously treated her in 1947 and that her blood pressure at that time was 206 over 120; that this was extremely severe for a woman of her age. He testified that with such a high blood pressure a cerebral accident could be expected at any time. He gave it as his opinion, however, that the cerebral hemorrhage suffered by Mrs. Brown was a direct result of the conduct of Freeman and Graves on the evening in question.

Dr. Beasley, who had treated Mrs. Brown over a period of some ten years, corroborated the testimony of Dr. Moore as to her physical condition, but the effect of his testimony is that he could not state the cerebral hemorrhage was the direct result of the disturbance caused by the defendant Graves and his friend Freeman.

Counsel for Graves relies on several grounds for reversal but we consider it necessary to discuss only the question

382

whether the evidence is sufficient to sustain the conviction.

Involuntary manslaughter usually is defined as the unintentional killing of a person by another in doing some unlawful act not amounting to a felony or not likely to endanger life, or in doing a lawful act in an unlawful manner. 26 Am.Jur., Homicide, page 189, section 44.

■ At early common law the view prevailed that responsibility for homicide did not attach where there was no physical or corporeal injury. The rule has been relaxed through the years so that now a conviction may be sustained for a death caused by fright, fear, or terror alone, even though no hostile demonstration or overt act was directed at the person of the deceased. 40 C.J.S., Homicide, § 11, page 852. As might be expected, there is some lack of uniformity among different jurisdictions in the extent of relaxation of the early common law rule. The case of In re Heigho, 18 Idaho 566, 110 P. 1029, 32 L.R.A.,N.S., 877, is listed in the text as being typical of the modern trend. 26 Am.Jur., Homicide, page 190, section 47; 40 C.J.S., Homicide, § 11, page 852. The same text lists Kentucky as adhering more closely to the common law rule than do many other jurisdictions. In our examination of the authorities, however, we have found no case where a conviction has been upheld unless the act of the accused which resulted in the death was either illegal or essentially dangerous.

We look to the Kentucky cases. In Commonwealth v. Couch, 106 S.W. 830, 831, 32 Ky.Law Rep. 638, 16 L.R.A.,N.S., 327, the defendant had discharged a pistol upon a public highway in a reckless manner in the presence of a woman who was pregnant. The woman became frightened, suffered a miscarriage, and subsequently died. It was held that the evidence was not sufficient to sustain a conviction for manslaughter, the Court saying, "in each and all of these and similar cases it has and must appear that death was the natural and probable consequence of the unlawful act complained of."

In Hubbard v. Commonwealth, 304 Ky. 818, 202 S.W.2d 634, 636, the defendant was arrested for drunkenness by a deputy sheriff. He attempted to break away from the deputy, and Dyche, the county jailer, joined the deputy in attempting to restrain the defendant. In the scuffle which ensued, the defendant and Dyche fell on the floor. Dyche had a heart attack. He moaned and rolled about in the courthouse yard for something like a half hour and then died. It was held that the evidence was not sufficient to sustain a conviction for manslaughter, the decision being based upon this language:

"It seems to us that where the cause of death was not due to a corporal blow or injury (essential under the early common law) or to some hostile demonstration or overt act directed towards the person of the decedent, there is no criminal liability unless death or serious bodily harm was the probable and natural consequence of an indirect, and unlawful act of the accused. If there is reasonable doubt of this, it would be unjust to punish the accused. * * *

"It is, at least, speculative to say that the act of the defendant in this case was sufficiently proximate to impose criminal responsibility upon him for the unfortunate death. We are of opinion, therefore, that the court should have directed an acquittal."

It seems to us that in the Hubbard case the evidence for the Commonwealth is fully as strong, if not stronger, than it is here and that the Court's language in that case is controlling here. Also see Hendrickson v. Commonwealth, 85 Ky. 281, 3 S.W. 166.

■ Although Graves' conduct was completely reprehensible and in violation of every concept of decency and good manners, we are forced to the conclusion that the evidence is not sufficient to sustain a conviction for involuntary manslaughter.

The judgment is reversed.