Joseph K. LOFTHOUSE, Appellant,

v.

COMMONWEALTH of Kentucky, Appellee.

No. 1998–SC–0632–DG.

Supreme Court of Kentucky.

Feb. 24, 2000.

Russell J. Baldani, Baldani, Rowland & Richardson, Lexington, for appellant.

A.B. Chandler, III, Attorney General, Frankfort, Courtney J. Hightower, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, for appellee.

COOPER, Justice.

Jerry Buford died of a drug overdose at his residence in McCracken County, Kentucky, during the early morning hours of April 11, 1995. Specifically, his cardiovascular, pulmonary and central nervous systems failed as a result of his voluntary ingestion of quantities of alcohol, cocaine and heroin. Appellant Joseph K. Lofthouse had provided Buford with the cocaine and heroin which contributed to his death. Following a trial by jury, Appellant was convicted of reckless homicide, KRS 507.050, and of two counts of trafficking in a controlled substance in the first degree, KRS 218A.1412. He was sentenced to one year in prison for his conviction of reckless homicide, and to five years in prison for each of his convictions of trafficking in a controlled substance. The sentences were ordered to run consecutively for a total of eleven years. The Court of Appeals affirmed and we granted discretionary review. CR 76 .20. We now affirm in part and reverse in part, vacating the conviction of reckless homicide and affirming the convictions of trafficking in a controlled substance in the first degree.

## I. FACTS.

Appellant did not testify at trial, but the jury heard a statement which he gave to the police on April 12, 1995. In that statement, Appellant admitted that he furnished the cocaine and heroin to Buford while visiting in Buford's home on the night in question. He stated that he and

Buford had "shot" cocaine together on previous occasions without life-threatening results. Appellant had obtained the cocaine and heroin from his regular drug supplier, who sold him the cocaine, but gave him the heroin as "something new" which Appellant should try. Appellant had, himself, ingested some of the heroin prior to the night of Buford's death. On the night in question, Appellant and Buford first consumed some beer, then decided to use the cocaine. Each ingested a quantity of the cocaine by intravenous self-injection. Several hours later, they drank some more beer and ingested some more of the cocaine. Still later, they decided to try the heroin, which they also ingested by intravenous self-injection. According to Appellant, Buford told him he had seen heroin before and knew what it was. Shortly after ingesting the heroin, Buford began perspiring heavily and went into his bedroom and lay down in front of an electric fan.

Buford's girlfriend, Amy Golden, left the residence when she saw that the two men were going to use drugs. When she returned three or four hours later, Buford was sitting on his bed and appeared to be drunk. Golden remained in the residence only a few minutes, then again departed. When she returned shortly after 2:00 a.m., she found Appellant in the kitchen drinking beer and listening to the radio and Buford in the bedroom unconscious and cold to the touch. Golden called to Appellant for help, then telephoned for emergency medical assistance. Appellant and Golden attempted to resuscitate Buford, but when the emergency medical personnel arrived, he was dead. A subsequent autopsy examination revealed the cause of death to be "cocaine, ethanol and morphine toxicity." (Heroin is a derivative of morphine.)

## II. RECKLESS HOMICIDE.

Prior to the adoption of the penal code, proof of causation sufficient to convict of criminal homicide required either a direct act of force by the defendant against the victim, or an indirect act by the defendant, the probable and natural consequence of which was the death of the victim. J. Roberson, *Kentucky Criminal Law and Procedure* § 278 (2d ed. Anderson 1927); *e.g., Graves v. Commonwealth,* Ky., 273 S.W.2d 380 (1954); *Hubbard v. Commonwealth,* 304 Ky. 818, 202 S.W.2d 634 (1947). In *Graves,* the defendant had unlawfully entered the victim's house and created a disturbance. He then departed, but returned and began pounding on the front door and rapping on the bedroom window. As a result of the excitement, the victim, who suffered from high blood pressure, died of a cerebral hemorrhage. The defendant's subsequent conviction of manslaughter was reversed for insufficient evidence of causation. In *Hubbard,* the defendant was arrested for drunkenness and taken before the county judge by the jailer and a deputy. When the judge ordered the defendant returned to jail, the defendant resisted and put up a struggle. The jailer suffered from a serious heart condition. Although no force was directed against him, the jailer suffered a heart attack during the affray and died. The defendant's subsequent conviction of manslaughter was set aside on grounds that it was purely speculative as to whether the defendant's unlawful act was sufficiently proximate to impose criminal responsibility upon him for the jailer's death.

The common law also recognized the concept of the intervening or superseding cause. An "independent intervening cause" was one which was only coincidentally produced by the defendant and relieved him of criminal responsibility unless it was reasonably foreseeable at the time of his conduct. A "dependent intervening cause" was one which was a consequence of the defendant's conduct. If the dependent intervening cause consisted of something other than a human act, it did not relieve the defendant of criminal responsibility; but if it consisted of a human act, criminal liability depended upon whether

the act was a normal or an abnormal response to the defendant's conduct. Thus, in *Bush v. Commonwealth*, 78 Ky. 268 (1 Rodm.)(1880), the defendant was held not criminally liable for homicide where he inflicted a non-fatal wound upon the victim, who subsequently died of scarlet fever as a result of the negligence of the treating physician; but in *Sanders v. Commonwealth*, 244 Ky. 77, 50 S.W.2d 37 (1932), a conviction of manslaughter was upheld where the defendant threatened his wife with a deadly weapon while they were in a moving vehicle and she jumped from the vehicle to her death. And in *Cassell v. Commonwealth*, 248 Ky. 579, 59 S.W.2d 544 (1933), it was held that a defendant could be criminally liable for poisoning his wife whether he administered the poison himself or whether he put the poison in her way to take innocently. *Id.*, 59 S.W.2d at 547. *See generally* R. Lawson, *Kentucky Penal Code: The Culpable Mental States and Related Matters*, 61 Ky.L.J. 657, 692–93 (1972–73).

The penal code addresses the issue of causation in the context of an unintentional homicide as follows:

> When wantonly or recklessly causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware. . . .

KRS 501.060(3). This provision was adopted from section 2.03 of the Model Penal Code. "[T]he plain intent of the statute is to have the causation issue framed in all situations in terms of whether or not the result as it occurred was either foreseen or foreseeable by the defendant as a reasonable probability." R. Lawson and W. Fortune, *Kentucky Criminal Law*, § 2–4(d)(3), at 74 (LEXIS 1998).

Appellant was convicted of reckless homicide, *i.e.*, of causing Buford's death while acting recklessly. KRS 507.050(1). The penal code defines "recklessly" as follows:

> "Recklessly"—A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020(4).

Appellant posits that, as a matter of law, one who furnishes narcotic drugs to a person who dies as a result of voluntarily ingesting those drugs cannot be liable for criminal homicide, because ingestion of narcotic drugs does not normally result in death. Appellant offered no evidence at trial to support this proposition, but relies primarily on a quote from a concurring opinion in a case decided by an intermediate appellate court in New York that "the proportion of such deaths [from narcotics] to the number of times narcotics are currently being used . . . is not nearly great enough to justify an assumption by a person facilitating the injection of a narcotic drug by a user that the latter is thereby running a substantial and unjustifiable risk that death will result from that injection." *People v. Pinckney*, 38 A.D.2d 217, 328 N.Y.S.2d 550, 556–57 (N.Y.App.Div.1972) (Shapiro, J., concurring). However, that statement also was unsupported by any evidence (which, presumably, is why it is in a separate concurring opinion rather than in the majority opinion). In *Pinckney*, the state was appealing the pre-trial dismissal of the indictment, so there had been no trial and no evidence. Apparently, the concurring judge was taking judicial notice of "the proportion of such deaths [from narcotics] to the number of times narcotics are currently being used ." In our jurisdiction, a fact cannot be judicially noticed unless it is "[c]apable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be

questioned." KRE 201(b)(2). We agree with the Tennessee Supreme Court that facts such as these are "more properly a matter of evidence than of judicial notice." *State v. Randolph*, 676 S.W.2d 943, 946 (Tenn.1984).

The majority opinion in *Pinckney, supra,* purported to rely on the fact that the Penal Law of New York contained no provision under which one who furnishes dangerous drugs to another could be held criminally liable for the other's death from voluntary ingestion of those drugs. We note that New York has not adopted section 2.03 of the Model Penal Code, thus does not have a statute equivalent to KRS 501.060(3). Furthermore, subsequent decisions of New York's highest court have not uniformly followed the reasoning expressed in *Pinckney*. *E.g., People v. Galle*, 77 N.Y.2d 953, 570 N.Y.S.2d 481, 573 N.E.2d 569 (1991); *People v. Cruciani*, 36 N.Y.2d 304, 367 N.Y.S.2d 758, 327 N.E.2d 803 (1975). Two of the other three cases cited by Appellant only hold that the defendant who furnished the fatal drugs could not be convicted of criminal homicide under the felony murder rule, discussed more fully *infra, State v. Dixon*, 109 Ariz. 441, 511 P.2d 623 (1973), *State v. Aarsvold*, 376 N.W.2d 518 (Minn.Ct.App.1985); and the third, *Commonwealth v. Bowden*, 456 Pa. 278, 309 A.2d 714 (1973), was decided solely on the basis that the evidence presented in that case was insufficient to support a homicide conviction.

The Commonwealth posits that, as a matter of law, the act of furnishing narcotic drugs to another creates a substantial risk of death to the transferee sufficient to convict of either second-degree manslaughter (awareness of and conscious disregard of the risk) or reckless homicide (failure to perceive the risk). In support of this proposition, the Commonwealth first asserts that KRS 218A.040 and KRS 218A.060 provide that schedule I and schedule II controlled substances, *e.g.,* heroin and cocaine, are inherently dangerous and pose a risk of death; and that knowledge of those facts is thereby statutorily imputed to anyone who traffics in those substances. In fact, neither statute recites that schedule I or schedule II controlled substances are inherently dangerous or pose a substantial risk of death. KRS 218A.040 provides *inter alia* that a schedule I substance has a high potential for abuse and either has no accepted medical use or lacks accepted safety for use in treatment under medical supervision. KRS 218A.060 provides *inter alia* that a schedule II substance has a high potential for abuse and that such abuse may lead to severe psychic or physical dependence. The language of neither statute establishes as a matter of law that the use of such substances poses a substantial risk of death.

The Commonwealth also cites a number of cases from other jurisdictions which hold that one who feloniously transfers a controlled substance to a person who dies as a result of its ingestion is criminally liable for that person's death. Some of those cases are from jurisdictions which premise criminal liability on the so-called "felony murder rule," *i.e.,* if death ensues as a consequence of the commission of a dangerous felony, the intent to commit the dangerous felony provides the element of intent necessary to convict of the homicide. *E.g., People v. Patterson*, 49 Cal.3d 615, 262 Cal.Rptr. 195, 778 P.2d 549 (1989); *People v. Taylor*, 112 Cal.App.3d 348, 169 Cal.Rptr. 290 (1980); *Heacock v. Commonwealth*, 228 Va. 397, 323 S.E.2d 90 (1984). Kentucky no longer subscribes to the felony murder rule. *Bennett v. Commonwealth*, Ky., 978 S.W.2d 322, 327 (1998). Other cases relied on by the Commonwealth are from jurisdictions with statutes reflecting a legislative intent to prosecute as homicides deaths resulting from the provision of controlled substances. *E.g., State v. Wassil*, 233 Conn. 174, 658 A.2d 548, 555 (1995); *Martin v. State*, 377 So.2d 706 (Fla.1979); *State v. Ervin*, 242 N.J.Super. 584, 577 A.2d 1273 (1990); *State v. Thomas*, 118 N.J.Super. 377, 288

A.2d 32 (1972).[1]  The Commonwealth's reliance on *Commonwealth v. Catalina*, 407 Mass. 779, 556 N.E.2d 973 (1990) is also misplaced.  The Massachusetts Supreme Court only held in that case that the evidence presented to the grand jury was sufficient to support an *indictment* for criminal homicide and specifically noted that it was not deciding whether the evidence was sufficient to prove guilt beyond a reasonable doubt.  *Id.* at 979.

■  Thus, we reject both Appellant's proposition that furnishing controlled substances to one who subsequently dies from their ingestion can *never* support a conviction of criminal homicide and the Commonwealth's proposition that such will *always* support a conviction.  Instead, we hold that guilt of criminal homicide, like any other offense, depends upon proof.  *Commonwealth v. Catalina, supra.*  For example, in the Tennessee case of *State v. Randolph, supra,* there was evidence that another of one defendant's customers had died the same way two weeks earlier, and that another defendant knew that the heroin sold to the victim was "uncut" and dangerous because it had not been diluted.  And in the New York case of *People v. Cruciani, supra,* there was evidence that the defendant injected the victim with heroin after she was already "bombed out" on depressants and that the defendant was aware of the substantial possibility that the injection would cause the victim's death.

■  Appellant's conviction of reckless homicide in the case *sub judice* required proof beyond a reasonable doubt that there was a substantial and unjustifiable risk that Buford would die if he ingested the cocaine and heroin furnished to him by Appellant, and that the risk of Buford's death was of such nature and degree that Appellant's failure to perceive it constitut-ed a gross deviation from the standard of care that a reasonable person would observe in the situation, KRS 507.050, KRS 501.020(4);  *i.e.,* that Buford's death as a result of ingestion of the cocaine and heroin was either foreseen or foreseeable by Appellant as a reasonable probability, KRS 501.060(3).  Thus, the Commonwealth needed to prove not only the toxic qualities of cocaine and heroin, but also that a layperson, such as Appellant, should reasonably have known that there was a substantial risk that the amount of cocaine and heroin ingested by Buford would result in his death.  That is especially true where, as here, Appellant did not directly cause the victim's death, but only furnished the means by which the victim caused his own death.  In the Pennsylvania case of *Commonwealth v. Bowden, supra,* evidence that the defendant injected the victim with the fatal dose of heroin was held insufficient to support a homicide conviction because it was undisputed that the defendant knew the victim's tolerance level for heroin and injected only an amount which the victim had normally tolerated.

Although the medical examiner in our case testified that the amount of morphine found in Buford's body "can be fatal" and that the amount of cocaine found in his body "could be fatal," there was no proof that Appellant or any other layperson should have been aware that there was a substantial risk that Buford would die from ingesting those substances, or that Appellant's failure to perceive that risk constituted a gross deviation from the standard of care that a reasonable person would observe in the situation.  Such information is not "common knowledge."  On the other hand, there was evidence that heroin was "something new" to Appellant; that he, himself, had previously ingested dosages of both the cocaine and the heroin in question without a fatal result;  and that

1.  In *Thomas,* the New Jersey court also held that the unlawful transfer of narcotic drugs in that case was, as here, an essential element necessary for conviction of the homicide offense and vacated the narcotics convictions on double jeopardy grounds.  That issue has been neither raised nor argued at trial or at either level of appeal in this case.  *But see Bennett v. Commonwealth, supra,* at 326–28.

he, himself, ingested the same dosages of cocaine and heroin as Buford on the same occasion, yet remained coherent enough to assist in efforts to save Buford's life. The Commonwealth proved only that the dosages were fatal to Buford. That alone was insufficient to convict Appellant of reckless homicide.

*Compare People v. Duffy*, 79 N.Y.2d 611, 584 N.Y.S.2d 739, 595 N.E.2d 814 (1992), in which the defendant was convicted of reckless homicide on evidence that he knew the victim was suicidal, that he furnished the victim with a firearm, and that he urged the victim to kill himself, which he did. Presumably, merely furnishing the victim with the instrument of his death, *i.e.*, the firearm, would not alone have been sufficient to sustain the conviction. Likewise, Appellant's act of furnishing Buford with the cocaine and heroin was not alone sufficient to sustain his conviction of reckless homicide.

## III. TRAFFICKING IN CONTROLLED SUBSTANCES.

■■■ Appellant asserts that his convictions of trafficking in heroin and cocaine were predicated solely upon his own uncorroborated confession, thus, the evidence was insufficient to support those convictions. Criminal Rule 9.60 precludes the conviction of a defendant solely on the basis of his own uncorroborated out-of-court statements. However, the requirement of corroboration relates only to proof that a crime was committed, not to whether the defendant committed it. *Commonwealth v. Karnes*, Ky., 849 S.W.2d 539 (1993); *Slaughter v. Commonwealth*, Ky., 744 S.W.2d 407, 410 (1987), *cert. denied*, 490 U.S. 1113, 109 S.Ct. 3174, 104 L.Ed.2d 1036 (1989). Once the corpus delicti has been established, the fact that the defendant committed the crime can be proven entirely by his own confession. *Dolan v. Commonwealth*, Ky., 468 S.W.2d 277 (1971). Finally, the corroborative evidence need not be such that, independent of the confession, would prove the corpus delicti

beyond a reasonable doubt; and proof of the corpus delicti may be established by considering the confession as well as the corroborating evidence. *Blades v. Commonwealth*, Ky., 957 S.W.2d 246, 250 (1997).

Here, in addition to Appellant's confession, there was proof that the cause of Buford's death was ingestion of cocaine and heroin. Heroin was found in the bathroom of the residence, and the syringes and spoons found at the scene tested positive for both heroin and cocaine. Amy Golden testified that although she knew Buford had taken drugs in the past, he had not done so during the year that she had been living with him (from which the jury could infer that the heroin and cocaine found in the home did not belong to Buford); that she had never seen Buford use syringes like the ones found at the scene; that she saw Appellant produce the needles which were used to inject the drugs; and that a black Newport bag which was found at the scene and which contained two syringes and other drug paraphernalia, did not belong to Buford. This was sufficient circumstantial evidence to corroborate Appellant's confession that he brought a quantity of cocaine and heroin to Buford's residence and transferred it to Buford in violation of KRS 218A.1412.

Accordingly, the decision of the Court of Appeals is affirmed in part and reversed in part. That portion of the judgment of the McCracken Circuit Court which convicted Appellant of reckless homicide and sentenced him to one year in prison for that offense is vacated; and that portion of the judgment which convicted him of two counts of trafficking in a controlled substance in the first degree and sentenced him to an aggregate term of ten years in prison for those offenses is affirmed.

LAMBERT, C.J., and KELLER, J., concur.

STUMBO, J., concurs by separate opinion, with JOHNSTONE, J., joining that concurring opinion.

WINTERSHEIMER, J., dissents by separate opinion.

GRAVES, J., not sitting.

STUMBO, Justice, concurring.

This Court granted review in this case because it raises an issue of first impression. The precise question of first impression presented is whether, absent specific legislation, a defendant may be convicted of criminal homicide for providing a controlled substance to one who then dies following voluntary ingestion of said substance. The majority answers this question with a resounding "maybe." I would answer the question with a definitive "no."

My reasons for so concluding are twofold. First, I am unconvinced that the mere act of providing drugs to another creates a substantial and unjustifiable risk that death will result; and second, I do not believe the mere provision of drugs can ever be the cause of death of one who knowingly and voluntarily consumes the substances.

In order to convict one who provides drugs to another of a homicide, the Commonwealth must establish each statutory element of the particular homicide offense, in this case, reckless homicide. KRS 507.050 states that a person is guilty of reckless homicide when, "with recklessness he causes the death of another person." Reckless conduct is defined by KRS 501.020(4):

A person acts recklessly with respect to a result or to a circumstance ... when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

Thus, in order to sustain a conviction for reckless homicide, the Commonwealth must prove that the act of providing controlled substances to another, in and of itself, creates a substantial and unjustifiable risk that the recipient will die as a result. I am unpersuaded.

Rather, I find compelling the analysis of a New York case cited by Appellant involving statutory language identical to our own reckless homicide statute and facts similar to those in the instant case:

While there has recently been a substantial increase in deaths from narcotics, the proportion of such deaths to the number of times narcotics are currently being used by addicts and for legal medical treatment is not nearly great enough to justify an assumption by a person facilitating the injection of a narcotic drug by a user that the latter is thereby running a substantial and unjustifiable risk that death will result from that injection.

*People v. Pinckney*, 38 A.D.2d 217, 328 N.Y.S.2d 550, 556–57 (N.Y.App.Div.1972).

More importantly, I am unwilling to hold that the mere act of providing a person with controlled substances may be considered the "cause" of that person's death for purposes of criminal liability, when the person's own intervening act of voluntarily injecting himself with the drugs is clearly the direct cause of death. "[N]o act ... shall constitute a criminal offense unless designated a crime ... under this code or another statute of this state." KRS 500.020(1). The legislature criminalized Appellant's act of transferring narcotics to a second person when it made drug trafficking a crime pursuant to KRS 218A.1412. I see no intention on the part of the legislature to further penalize this same conduct by categorizing it as a type of homicide when a death results,[1] espe-

---

1. I would note that KRS 216.302 criminalizes the act of "provid[ing] the physical means by which another person commits or attempts to commit suicide." Thus the legislature has chosen another context, distinct from that of drug trafficking, in which to condemn the act of providing a controlled substance to another. Here, however, there was no allegation made nor proof offered that Buford intended to commit suicide.

cially given the above analysis of the elements of reckless homicide. *Cf.* KRS 507.020(1)(b) which specifically includes "operation of a motor vehicle" as a means of committing murder.

In sum, I am unconvinced that the act of providing drugs to another could ever be considered reckless homicide. To hold otherwise would be, in my opinion, to extend the law of homicide beyond that intended by the legislature, something which is not within our power to do. Therefore, although I concur with the result reached by the majority, I disagree with analysis by which it reached its conclusion.

JOHNSTONE, J., joins this concurring opinion.

WINTERSHEIMER, Justice, dissenting.

I respectfully dissent in part from the majority opinion because reckless homicide is a viable and appropriate avenue to address Lofthouse's conduct under the facts presented. I would affirm the conviction in all respects.

The legislature of this Commonwealth promulgated KRS 507.050 defining reckless homicide, and in so doing fashioned a tool responsive to a broad range of conduct which, while not culpable to the same degree as intentional or wanton murder, still demands proportional condemnation.

> The gravamen of the offense is the failure to perceive a substantial and unjustified risk when such failure is a gross deviation from the standard of care that a reasonable person would observe in the situation. It is obvious that no specific intent that the act or omission cause injury is required. Nor is there any requirement to show a subjective realization on the part of the actor that his conduct creates a substantial risk.

*Robinson v. Commonwealth,* Ky.App., 569 S.W.2d 183 (1978). Lofthouse exhibited just such a mental state in knowingly providing a lethal combination of Schedule I and Schedule II narcotics to the victim, and his actions sit squarely within the parameters of KRS 507.050.

Kentucky's reckless homicide provision is focused on the actor's subjective failure to perceive a substantial and unjustifiable risk that a result will occur or a circumstance will exist as a result of his behavior. KRS 501.020(4). *See Elliott v. Commonwealth,* Ky., 976 S.W.2d 416 (1998). The concentration then is necessarily on the mental state of the actor, not on the act itself. The argument by Lofthouse that language from *People v. Pinckney,* 38 A.D.2d 217, 328 N.Y.S.2d 550 (N.Y.App. Div.1972), appears to suggest a different approach by pointing out that, generally speaking, heroin injection does not induce death is vacuous. Typical outcomes, though one possible factor in the actor's assessment of risk, are not the correct measure of his mental state. In order to comport with the meaning of reckless homicide in this state, it is irrelevant whether or not heroin injection is inexorably bound in the collective conscience with death, but whether the actor should have been on notice of a substantial and unjustifiable risk in this particular case.

Moreover, the *Pinckney, supra,* reasoning as to the objective risks of heroin use is dubious. The high mortality rate associated with the injection of heroin, its variable potency, and the fact that even where the same volume of the drug is injected, minor disruptions in a user's patterns or circumstances of use can mean the difference between a high and an overdose, are common knowledge to a large segment of the law-abiding American public. I find it wholly implausible that an active drug user utilizing the type, quantity and the methods of delivery of the drugs conceded in this case would be unaware of the inherent risks through both his experience and the illegality of the activity. In supporting involuntary manslaughter indictments in a case of heroin provision, the Massachusetts Supreme Judicial Court in *Commonwealth v. Catalina,* 407 Mass. 779, 556 N.E.2d 973, 980 (1990), quoted *People v.*

*Cruciani,* 334 N.Y.S.2d 515 (N.Y.Co.Ct. 1972).

> From a careful study and analysis of the majority of prevailing legal precedents in the United States as well as the medical studies and statistical data compiled, one can reasonably conclude that the consumption of heroin in unknown strength is dangerous to human life, and the administering of such a drug is inherently dangerous and does carry a high probability that death will occur. It is not unreasonable to conclude that the injection of heroin into the bloodstream of a human being constitutes a substantial and unjustifiable risk of death.

Given a logical deduction about Lofthouse's subjective awareness and objective data from common knowledge and expert opinion about the hazards of heroin (not to mention use in combination with cocaine) injection, the degree of circumspection he exercised should be assessed accordingly.

A second significant factual distinction from *Pinckney* is that we have a situation in which Lofthouse not only failed to perceive the foreseeable risks associated with the provision of several doses of one particularly nefarious depressant (heroin), but compounded that already substantial and unjustifiable risk by introducing a potent stimulant (cocaine) as well. Lofthouse had actual knowledge of the victim's antecedent drug and alcohol consumption during the course of the evening and, it appears, the victim's history of chronic substance abuse. Inappositely, *Pinckney* involved a passing drug deal and not a prolonged exchange such as was shared by Lofthouse and the victim in this case.

In addition to the factual dissimilarities to the present case, there have been major developments in New York law subsequent to the 1972 *Pinckney* holding. In its discussion of legislative intent, the *Pinckney* decision does not suggest that the New York Legislature intended to distinguish between deaths as a result of the transfer of drugs and of the administration of drugs, but rather noted the function of the legislature, historically, in promulgating drug policy. In a subsequent controlling opinion, *People v. Cruciani,* 36 N.Y.2d 304, 367 N.Y.S.2d 758, 327 N.E.2d 803 (1975), the New York Court of Appeals upheld a conviction where the defendant had actually injected the drugs into the assenting victim, but in doing so, the court revisited the result in *Pinckney.* Taking that opportunity to recast the earlier intermediate court holding, the Court of Appeals determined that *Pinckney* had been predicated not on legislative intent, but rather on an insufficient showing of causation. Thus restated, the court affirmed Cruciani's second-degree manslaughter conviction, finding mens rea and causation not merely in the act of injecting the drugs into the victim, but in the broader context of making them available despite his knowledge of the victim's present condition. Explaining its result the court stated:

> [In *Pinckney*] the defendant had sold the drug to the deceased, but did not inject the heroin. Nor was there any proof, as here, of *awareness* of the ongoing effect of drugs in the victim's body at the time any self-inflicted injection might have been made, or beyond the general knowledge of the injuriousness of drug-taking, of a real threat to life. The remoteness of the fatal injection from the fact of sale diffused intent and scienter by possibly unknown or intervening events beyond Pinckney's control. (Emphasis added).

*Cruciani, supra,* at 804. Unlike *Pinckney,* however, a Commonwealth jury determined that Lofthouse enjoyed no such dislocation from the events of the evening of April 11, 1995. Lofthouse was present and witness to the victim's consumption and, in fact, provided in an on-going basis, the combination of drugs that ultimately resulted in death. Even assuming that supplying the heroin alone was not a sufficient deviation from a reasonable standard of care to trigger criminal liability, Lofthouse's introduction of the cocaine, togeth-

er with his knowledge of alcohol use and of the victim's potential psychological vulnerability to drug abuse, can only be described as gross and unjustifiable indifference to the risks.

Lofthouse acknowledges the dangerous nature of the drugs used that night and the grievous social ill that attends them, but insists that the General Assembly's failure to explicitly articulate that drug transfers be subject to the reckless homicide statute signals an unwillingness to extend criminal liability. What Lofthouse ignores, however, is that determination of such an inherently subjective mental state as recklessness should necessarily be factual. Although it is established law that where "the legislature speaks within the limits of the Constitution, its declaration of public policy is conclusive," *Allin v. American Indemnity Co.*, 246 Ky. 396, 55 S.W.2d 44, 45 (1932), there follows no negative corollary proscribing judicial action in the public interest where the Constitution and codes are silent. *See Eversole v. Eversole*, 169 Ky. 793, 185 S.W. 487, 489 (1916). Resisting the recent trend as exhibited in New Jersey, Florida, Connecticut, Louisiana, Nevada, Pennsylvania, Washington and Minnesota of imposing criminal liability (often strict liability) in drug transfers resulting in death, *see* Blair Talty, *New Jersey's Strict Liability for Drug Induced Deaths: The Leap From Drug Dealer to Murderer*, 30 Rutgers, L.J. 513 (1999), the General Assembly of this Commonwealth has implicitly recognized that judicial inquiry on a case by case basis is a more appropriate means of determining whether conduct manifest in a drug transfer falls within KRS 507.050, another available homicide provision, or none at all.

As counsel for the Commonwealth recognizes, the reckless homicide statute offers a sound mechanism to address wildly irresponsible handling of potentially lethal narcotics, particularly in light of the General Assembly's rejection of the felony-murder doctrine from common law. That rejection necessarily encouraged the uti-

lization in Kentucky, as in other states, of other homicide provisions to reach crimes of lesser culpability than murder. *See, e.g., Baker v. Commonwealth*, Ky., 922 S.W.2d 371 (1996) (illustrating application of reckless homicide resulting from commission of a dangerous felony). In eliminating felony-murder, it was not the Kentucky Penal Code drafters' intention to obstruct the prosecution of individuals who killed without intent, but rather to replace an outmoded common law concept problematic to elements of both mens rea and causation, in favor of more precise provisions requiring the establishment of mental states in securing homicide convictions. *See* KRS 507.020, Official Comment; *see also,* Robert G. Lawson, *Criminal Law Revision in Kentucky: Part I—Homicide and Assault*, 58 KY.L.J. 242, 255 (1970). A law exists to address the actions of Lofthouse and a Commonwealth jury correctly applied it.

There is nothing radical for a court to acknowledge that the injection of cocaine and heroin is unjustifiably dangerous. It is important to remember that while the tragic consequence was suffered by an assenting decedent, the crime committed was against the Commonwealth. "Consent . . . or her own possible recklessness may add to the pathos in this tragic episode between drug users, but it is not available as a defense in these circumstances. The crime charged was against the People." *Cruciani, supra* at 804–805. Kentucky has a vested interest in protecting all of its citizens from the illegal acts of thoughtlessness of reckless individuals who would help precipitate their demise. Perhaps this duty is heightened where drug addiction, almost universally recognized as a disease in the medical community, makes some of our citizens more vulnerable to the depredations of others. Only an outmoded concept of free will can justify labeling a habitual drug user's voluntary act of consuming narcotics an intervening one capable of severing causation, in light of the voluminous and reliable data available on substance abuse and its associated neuro-

logical corruptions of the human brain. *See Robinson v. California,* 370 U.S. 660, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) *See generally, Report on Narcotic Addiction,* 165 A.M.A.J. 1707. This holding today, as it relates to causation, puts us at variance with the majority of our sister states who have addressed the issue with a contemporary understanding of drug abuse.

Given the established facts and the instructive case law dealing directly with this issue, I would hold that the record supports a jury finding of reckless homicide. Lofthouse's conduct, fell perilously below that of a reasonable person, and but for that fact his friend might well be alive today. I can see no considered basis upon which to conclude that, under the present facts, provision of heroin and cocaine to the victim did not exceed the substantial and unjustifiable risk defined in KRS 507.050. The statement in the majority opinion that guilt of criminal homicide, like any other offense, depends upon proof, has an enticing simplicity. Certainly, nothing could be more fair. Such an analysis ignores the specific facts of this case. Here, we are dealing with an inherently dangerous substance in that the reaction of each individual who ingests it is totally unpredictable. The result of the majority's holding in this case is that a drug transfer which ultimately produces death does not constitute reckless homicide regardless of the egregiousness of the drug purveyor's conduct, provided the victim voluntarily consumes. With that proposition I must emphatically disagree.

I would affirm the conviction in all respects.