RENDERED: MARCH 1, 2024; 10:00 A.M.
NOT TO BE PUBLISHED

# Commonwealth of Kentucky

# Court of Appeals

NO. 2022-CA-1201-MR

KEYONA BINGHAM                                                      APPELLANT

v.

APPEAL FROM TRIGG CIRCUIT COURT
HONORABLE JAMES R. REDD, III, JUDGE
ACTION NO. 20-CR-00033

COMMONWEALTH OF KENTUCKY                                            APPELLEE

OPINION
AFFIRMING

** ** ** ** **

BEFORE: ACREE, COMBS, AND ECKERLE, JUDGES.

ECKERLE, JUDGE: Appellant, Keyona Bingham (Bingham), left her baby and her toddler alone and helpless at home, where they died in a house fire while she drove down the street to obtain a Lortab pill from a relative. A jury convicted her of two counts of Reckless Homicide, and the Trial Judge sentenced her to a term of imprisonment for 10 years. She appeals the judgment and sentence as a matter of

right. Having reviewed the record and the arguments of counsel, we affirm the judgment and sentence.

## BACKGROUND

On April 7, 2020, around 1:00 p.m., Bingham got in her car and left her three-year-old and her seven-month-old children at home alone and unsupervised. Utterly helpless, they perished when their house caught fire while Bingham was gone.

Bingham left to obtain a Lortab pill, for which she did not have a prescription. Bingham claimed she was having back pain that day, allegedly a result from long-term injuries to her back from previous accidents. She self-treated her back pain with over-the-counter medications and prescription medications she obtained from family members. She had called her stepfather before leaving, and he offered her a Lortab if she would drive down to his house to retrieve it. The round trip to his residence was roughly three miles and took a few minutes.

Rather than take the children with her during her mid-day trip, Bingham strapped her three-year-old to a highchair and placed her baby on the couch. It appears between five and 15 minutes transpired while the children were alone. Time stamps on surveillance footage showed Bingham's vehicle entered her stepfather's neighborhood at 1:14 p.m. and left at 1:18 p.m. Witnesses placed the fire's inception sometime between 1:06 p.m. and 1:14 p.m. At 1:20 p.m., a

witness called 911 to report the fire. Bingham had returned to the residence before the 911 call was initiated. Witnesses described Bingham as yelling for help, saying people were inside, and running back and forth toward the house. A person passing by unsuccessfully attempted entry, then unsuccessfully attempted to use a hose in an effort to tame the fire. Bingham claimed she attempted entry and allegedly burned her skin attempting to rescue the children. However, one of the first officers on the scene did not recall any soot or dirt on Bingham.

The cause of the fire was never determined. Both children perished due to smoke inhalation.

A responding officer spoke briefly with Bingham. Despite telling her he needed to ask her some questions, Bingham left while the officer attended to his duties. He found Bingham nearby but was pressed by others near to Bingham to allow her to leave. The detective in charge told the officer to let Bingham go.

A few hours later, Bingham talked to the police officers. Bingham lied. She stated she had taken the children with her to her stepfather's house. She claimed that upon returning to her house, she put the children inside the house, then went to the car to retrieve a diaper, only to turn around and find the residence engulfed in flames. Bingham later gave a second statement, again not initially telling the truth.

Bingham then told the police that she left the children home alone while she went to retrieve a Lortab. She admitted there were serious, electrical problems at the residence that were so bad she should not have been living in the house. At trial, Bingham explained that the electrical problems would cause the breaker to trip.

The Trigg County Grand Jury indicted Bingham on two counts of Manslaughter in the Second Degree. At trial, the jury found Bingham guilty of two lesser-included counts of Reckless Homicide. The jurors recommended five-year imprisonment sentences regarding each victim, running consecutively for a total prison sentence of 10 years. The Trial Court followed the jury's recommendation. Bingham now appeals the judgment and sentence as a matter of right.

## ANALYSIS

Bingham raises five issues on appeal. We review them *seriatim*.

## I.      Did the Trial Court err by denying the motion for directed verdict?

Bingham first claims that the Trial Court should have granted a directed verdict on Reckless Homicide. The standard of review on a directed-verdict claim is well established:

> On [a] motion for directed verdict, the trial court must draw all fair and reasonable inferences from the evidence in favor of the Commonwealth. If the evidence is sufficient to induce a reasonable juror to believe

beyond a reasonable doubt that the defendant is guilty, a directed verdict should not be given. For the purpose of ruling on the motion, the trial court must assume that the evidence for the Commonwealth is true, but reserving to the jury questions as to the credibility and weight to be given to such testimony.

On appellate review, the test of a directed verdict is, if under the evidence as a whole, it would be clearly unreasonable for a jury to find guilt, only then the defendant is entitled to a directed verdict of acquittal. [*Commonwealth v.*] *Sawhill*[, 660 S.W.2d 3 (Ky. 1983)].

As stated in *Sawhill*, there must be evidence of substance, and the trial court is expressly authorized to direct a verdict for the defendant if the prosecution produces no more than a mere scintilla of evidence.

*Commonwealth v. Benham*, 816 S.W.2d 186, 187-88 (Ky. 1991). *See also Ray v. Commonwealth*, 611 S.W.3d 250, 266 (Ky. 2020).

A jury convicted Bingham of Reckless Homicide, which means she caused her children's deaths while acting recklessly. *Lofthouse v. Commonwealth*, 13 S.W.3d 236, 239 (Ky. 2000) (plurality opinion) (citing KRS[1] 507.050(1)). "Recklessly" is defined as follows:

(4) "Recklessly" – A person acts recklessly with respect to a result or to a circumstance described by a statute defining an offense when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists. The risk must be of such nature and degree that failure to perceive it constitutes a

---

[1] Kentucky Revised Statutes.

gross deviation from the standard of care that a reasonable person would observe in the situation.

KRS 501.020(4). Additionally, Kentucky's Penal Code describes the causal relationship as:

> (3) When wantonly or recklessly causing a particular result is an element of an offense, the element is not established if the actual result is not within the risk of which the actor is aware or, in the case of recklessness, of which he should be aware unless:
>
> > (a) The actual result differs from the probable result only in the respect that a different person or different property is injured or affected or that the probable injury or harm would have been more serious or more extensive than that caused; or
> >
> > (b) The actual result involves the same kind of injury or harm as the probable result and occurs in a manner which the actor knows or should know is rendered substantially more probable by his conduct.

KRS 501.060(3).

The causal relationship provisions exist, "to have the causation issue framed in all situations in terms of whether or not the result as it occurred was either foreseen or foreseeable by the defendant as a reasonable probability." *Lofthouse*, 13 S.W.3d at 239 (quoting R. LAWSON AND W. FORTUNE, KENTUCKY CRIMINAL LAW § 2-4(d)(3), at 74 (LEXIS 1998)).

Bingham claims that the Commonwealth failed to prove that she "perceived a risk of a fire and her failure to perceive the risk of a fire was a 'gross

deviation from the standard of conduct a reasonable person would observe in the situation.'" Appellant's Brf. at 8. Bingham's argument relies heavily on *Commonwealth v. Mitchell*, 41 S.W.3d 434 (Ky. 2001) and *Lofthouse*, *supra*.

In *Mitchell*, a father was driving his wife and three children to a friend's house when he failed to yield the right of way to an oncoming pickup truck, resulting in a collision. None of his children was properly secured in the vehicle. The father and one of his children were thrown from the vehicle; that infant daughter would later die. The father was eventually indicted for Manslaughter in the Second Degree and convicted of Reckless Homicide. 41 S.W.3d at 434.

The Kentucky Supreme Court vacated the conviction, finding that the Trial Court should have granted a directed verdict of acquittal. The only evidence of recklessness on the father's part was his action of violating his statutory duty to secure the child in a car seat, and that statute prohibits a finding that such act is civil negligence per se and carries only a $50 penalty. *Id*. at 435 (citing KRS 189.125, KRS 189.990). The Kentucky Supreme Court held that failing to secure the child in a car seat, without any other evidence of recklessness, "is not sufficient to constitute the standard of recklessness required by KRS 507.050, which is a gross deviation from the standard of care that a reasonable person would observe in the situation." *Mitchell*, 41 S.W.3d at 435-36.

Bingham also relies on *Lofthouse*. There, the defendant furnished cocaine and heroin to another person, who ultimately overdosed and died. A jury convicted the defendant of Reckless Homicide. The Kentucky Supreme Court reversed the conviction,[2] holding that the evidence "that a defendant should have been aware of a substantial risk that the victim would die from ingesting cocaine and heroin was insufficient to support a conviction of reckless homicide for providing those drugs." *Mitchell*, 41 S.W.3d at 435.

To arrive at this conclusion, the Supreme Court summarized that the Commonwealth needed to prove beyond a reasonable doubt:

> that there was a substantial and unjustifiable risk that [the victim] would die if he ingested the cocaine and heroin furnished to him by Appellant, and that the risk of [the victim's] death was of such nature and degree that Appellant's failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe in the situation . . . *i.e.*, that [the victim's] death as a result of ingestion of the cocaine and heroin was either foreseen or foreseeable by Appellant as a reasonable probability[.]

*Lofthouse*, 13 S.W.3d at 241 (plurality opinion). *See also id.* at 243 (Stumbo, J., concurring) ("[I]n order to sustain a conviction for reckless homicide, the Commonwealth must prove that the act of providing controlled substances to

---

[2] Three Justices joined the plurality opinion, two concurred by separate opinion, one dissented, and one did not sit.

another, in and of itself, creates a substantial and unjustifiable risk that the recipient will die as a result.").

Based on these cases, Bingham argues that the Commonwealth failed to prove that there was a substantial and unjustifiable risk that her children would die in a fire if they were left alone in a house, and to prove that the risk of her children's deaths by fire was of such a nature and degree that Bingham's failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would observe in the situation.

The Commonwealth proffers two responses. First, the Commonwealth notes that the Trial Court held that it needed only prove broadly that there was a substantial and unjustifiable risk that the children would die if they were left alone in the house. Second, the Commonwealth proffers that Bingham was operating under a duty to take care of her children, which she breached in causing their deaths, noting the Trial Court found *West v. Commonwealth*, 935 S.W.2d 315 (Ky. App. 1996), applicable on this issue.

As to the first claim, whether the Commonwealth needed to prove only broadly the risk that the children could die if left alone or more narrowly the specific risk of dying in a fire, as we discuss *infra*, sufficient evidence was introduced to survive a directed-verdict motion on the narrow risk; thus, we need not determine if the broader risk would suffice. As to the second claim, a

discussion of *West* demonstrates its applicability herein both on the duty Bingham owed her children and the recklessness she exhibited toward her children's welfare.

In *West*, two caregivers of an adult with Down syndrome were charged with Manslaughter in the Second Degree and convicted of the lesser-included offense of Reckless Homicide when their neglect ultimately led to the adult dependent's death. In short, around Thanksgiving the victim became bedridden and would not eat. On December 31, the defendants finally brought the victim to the emergency room. The victim was clearly suffering. She presented there in an:

> horrific physical condition . . . [with] numerous decubitus ulcers (pressure or bedsores) in various stages of development (many severe enough to reveal muscle tissue and even bone), severe malnutrition, and the presence of dried tears and feces upon her body.

*West*, 935 S.W.2d at 316. The victim died almost three weeks after being brought to the emergency room. "Physicians attributed the cause of death to sepsis and confluent bronchial pneumonia precipitated by the decubitus ulcers." *Id*. "[C]aretaker neglect" ultimately led to the victim's death. *Id*.

On appeal, the defendants argued that they had no duty to care for the victim; thus, they could not be convicted of Reckless Homicide, which does not impose criminal liability based upon an omission or failure to act. *Id*. A panel of

-10-

this Court held that the defendants operated under a statutory duty as caregivers per KRS 209.020(6). *West*, 935 S.W.3d at 317. The defendants also argued that they should have been granted a directed verdict. This Court likewise rejected that argument, finding the evidence was sufficient to support the convictions. *Id*. at 318.

Having reviewed the case law, we hold that *Lofthouse* and *Mitchell* are factually distinguishable. In *Lofthouse* the defendant had no reason to believe the dosage of drugs would be fatal. Here, Bingham knew the residence's electrical problems posed a serious danger. And in *Mitchell*, the only evidence of recklessness was the failure to comply with a safety-restraint statute. Here, much like the defendants in *West*, Bingham breached her duty to care for her children, *see, e.g.*, *Smothers v. Baptist Hospital East*, 468 S.W.3d 878, 883 (Ky. App. 2015) ("The moral and natural duty of a parent to care for the needs of his or her child is clearly ingrained in the legal landscape of the Commonwealth."), and there was additional evidence of recklessness because she believed the residence was inherently unsafe.

Indeed, the evidence against Bingham was definitive and determinative on the specific risk of death. Notably, in *Mitchell* the only evidence of recklessness was the father's failure to secure the child in a proper child restraint system. 41 S.W.3d at 435. And in *Lofthouse*, the evidence did not prove that there

-11-

was a substantial risk that one would die from ingesting certain doses of cocaine and heroin; indeed, the proof was that the defendant had ingested the same dosages of cocaine and heroin as the victim without fatal result. 13 S.W.3d at 241-42. As the *Lofthouse* Court so aptly stated, "guilt of criminal homicide, like any other offense, depends upon proof." *Id.* at 241.

Here, the proof showed that Bingham knew that: (1) the residence had an inherently dangerous electrical problem; (2) her children would be utterly helpless when left alone; and (3) her trip for drugs would take more than several minutes. Bingham subjectively understood that dying in a fire was one substantial and unjustifiable risk to the children. Thus, she did not fail to perceive the risk of her children dying in a house fire and leaving the children there completely unattended, constituted a gross deviation from the standard of care that a reasonable person would observe in the situation. Thus, the evidence was sufficient to survive a motion for directed verdict. We affirm on this issue.

## II. Did the Trial Court err when instructing the jury?

Bingham next argues that the jury instructions were "bare bones" and "did not fully convey to the jury the elements of KRS 507.050, KRS 501.020, and KRS 501.060." Appellant's Brf. at 13. Bingham claims the jury instructions given allowed a jury to find Bingham guilty of killing her children by leaving them alone, omitting the element that the jury would have to find reckless behavior,

including a perceivable risk that a result will happen, *i.e.*, that a fire would kill the children.  Bingham further takes issue with the omission of both causation elements of KRS 501.060 in the instructions.  Bingham notes that the instructions do not align with the specimen instructions in *Robertson v. Commonwealth*, 82 S.W.3d 832 (Ky. 2002), which contain both the KRS 501.060(3) "risk" element and the KRS 501.060(3)(b) "substantially more probable" element.  Bingham further requests that we reverse pursuant to the *dissenting* opinion in *Robertson*.

The latter argument we need not address, as we are bound to follow the majority opinions of the Kentucky Supreme Court, and not the dissenting ones.  Supreme Court Rule 1.030(8)(a) ("The Court of Appeals is bound by and shall follow applicable precedents established in the opinions of the Supreme Court and its predecessor court.").

Concerning Bingham's other arguments, including the argument regarding the majority opinion in *Robertson*, we find no error here.  We review *de novo* the substance of jury instructions when the alleged error concerns whether the instruction accurately presented the applicable legal theory.  *Commonwealth v. Caudill*, 540 S.W.3d 364, 367 (Ky. 2018).  If we find an error, even an error that the instructions omitted an essential element of the offense, that error is presumed prejudicial unless there is a showing that the error is harmless.  *Id.* (citations omitted).

Here, the relevant instructions given to the jury read as follows:

Instruction 4
DEFINITIONS

. . .

2. Recklessly – A person acts recklessly with respect to a result or to a circumstance when he fails to perceive a substantial and unjustifiable risk that the result will occur or that the circumstance exists.  The risk must be of such nature and degree that failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

\* \* \*

Instruction 6
COUNT I
RECKLESS HOMICIDE
Victim Kamari Harries (DOB 12/29/16)

If you do not find the Defendant Keyona M. Bingham guilty under Instruction 5, you will find the Defendant guilty of Reckless Homicide under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county on or about April 7, 2020, and before the finding of the Indictment herein, she caused the death of Kamari Harris by leaving the child alone with no adult supervision;

AND

B. That in so doing, she was acting recklessly as that term is defined in Instruction 4.

Instruction 8 is also relevant but verbatim to Instruction 6, save for the victim's

name and date of birth.

-14-

Bingham claims these instructions omit both causation elements of KRS 501.060(3) and (3)(b), specifically noting that these instructions do not align with the specimen instructions in *Robertson*:

### RECKLESS HOMICIDE

If you do not find the Defendant guilty of Second-Degree Manslaughter under Instruction No. 1, you will find him guilty of Reckless Homicide under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt that in this county on or about January 4, 1998 and before the Indictment herein, he caused the death of Michael Partin by unlawfully fleeing from police apprehension,

AND

A. That the defendant failed to perceive a substantial and unjustifiable risk that his conduct would result in Michael Partin's death, and that the risk was of such nature and degree that his failure to perceive it constituted a gross deviation from the standard of care that a reasonable person would have observed in the same situation.

OR

B. That the death of Michael Partin occurred in a manner which the Defendant should have known was rendered substantially more probable by his conduct.

82 S.W.3d at 838.

Indeed, read together, Instructions 4 and 6 only contain the "risk" element of KRS 501.060(3), but not the "substantially more probable" element of

KRS 501.060(3)(b). But we need not hold that the same constitutes reversible

error, as the *Robertson* Court held:

> Nevertheless, the instructions given by the trial court
> were more favorable to Appellant than those in the
> specimen instructions above because each of the trial
> court's instructions allowed the jury only one alternative
> for finding guilt instead of two. Thus, they were not
> prejudicial to Appellant and would have afforded no
> basis for a new trial even if the issue had been preserved.

82 S.W.3d at 839 (citations omitted).[3]

---

[3] Curiously, Bingham's tendered instructions do not follow the *Robertson* specimen instructions either, as they also omitted the "substantially more probable" element of KRS 501.060(3)(b):

COUNT 1: RECKLESS HOMICIDE

If you do not find the Defendant guilty under Instruction No. ___, you will find the Defendant guilty of Reckless Homicide under this Instruction if, and only if, you believe from the evidence beyond a reasonable doubt all of the following:

A. That in this county, on or about April 7, 2020, and before the finding of the Indictment herein, she killed Kamari Harris by leaving him in a house for less than five (5) minutes;

AND

B. That in so doing, she failed to perceive a substantial and unjustifiable risk that Kamari Harris would die in a house fire;

AND

C. That the risk of Kamari Harris dying in a house fire during her absence was of such a nature and degree that her failure to perceive it constitutes a gross deviation from the standard of care that a reasonable person would observe in the situation.

Furthermore, though the instructions were "bare bones" and did not specify the exact risk of death by fire,[4] we note the *Robertson* specimen instructions likewise did not specify an exact risk of death *by plummeting into a body of water*, but rather stated only "caused the death of Michael Partin by unlawfully fleeing from police apprehension[.]" *Id.* at 838.

The parties herein were wholly aware that the risk was death during a fire. Kentucky "adhere[s] to the 'bare bones' principle of jury instructions[,]" and these "bare bones" instructions, though they omitted the "substantially more probable" element of KRS 501.060(3)(b), were neither "misleading" nor did they "misstate the law." *See Harp v. Commonwealth*, 266 S.W.3d 813, 819 (Ky. 2008). The jury instructions required a jury to find all statutory elements of Reckless Homicide: that Bingham caused her children's death by leaving them alone, and that Bingham was acting recklessly. *See* KRS 507.050, KRS 501.020(4), and KRS 501.060(3).

We also note that the Commonwealth responds that the Trial Court's given instruction was not erroneous as it comported with the specimen instructions from *Hager v. Commonwealth*, 41 S.W.3d 828, 846 (Ky. 2001). We do not opine on this argument as *Robertson* is dispositive. Accordingly, we affirm on this issue.

---

[4] Or more precisely, death *during* a fire, as the children died from smoke inhalation.

## III. Did the Trial Court err by not granting a continuance?

Bingham next argues the Trial Court abused its discretion by denying her motion for a continuance of the second trial date. The reason for the requested continuance concerned Bingham's desire to obtain an expert to assist her defense and possibly testify at trial regarding the testing of the Kentucky State Police Crime Laboratory ("Lab") of suspected accelerant found at the scene of the crime. The testing revealed no identifiable accelerant was present on the samples.

Notably, the testing results had not been turned over to Bingham's counsel until ten days before the second trial date. The substances were not even sent to the Lab until <u>after</u> the first trial date.[5] The Lab subsequently tested them and issued a report on April 8, 2022. The Commonwealth claimed it did not receive the test results until July 8, 2022, which was the same date it turned them over to Bingham's counsel. A few days later, Bingham's counsel moved for a continuance pursuant to RCr[6] 9.04, to enable her to hire an expert to evaluate the Lab's testing and results. Bingham's counsel also requested funds to hire an expert. Following a lengthy hearing, the latter motion was granted, and the former denied.

---

[5] The first trial date was continued at the Commonwealth's request due to two of its witnesses having exposures to COVID-19.

[6] Kentucky Rules of Criminal Procedure.

At the hearing, the Commonwealth noted that it had no reason to introduce the Lab's testing. The cause of the fire was undetermined, and the test results showed no signs of accelerant. Had the testing showed accelerant present, Bingham likely would have been facing murder charges. Bingham requested and was granted an *ex parte* hearing to explain her trial strategy to the Trial Court.

Bingham was attempting to craft an alternative perpetrator theory: a relative set the fire possibly for insurance money and possibly out of spite as she did not want Bingham living at the residence. The alternative perpetrator theory was based in part on the fact that a relative had moved the grandmother out of the residence the night before the fire and taken all of the flat-screen televisions. Also, there was information that someone had called the water company for the water to be shut off to the residence entirely. Bingham wanted to obtain an expert to review the testing, interpret the testing, help her understand the test results, and potentially testify at trial that accelerant can degrade over time and not be present in test results.

The Trial Court concluded the *ex parte* hearing and held an evidentiary hearing about the Lab test results, at which the Lab chemist who conducted the testing testified. The chemist stated the test results showed no presence of accelerants. Because accelerants are highly volatile, though, the chemist could not rule out that accelerants were present and were either consumed

in the fire or evaporated.  The chemist was available to testify for any party at the trial.

The Trial Court then conducted another *ex parte* hearing with Bingham, reviewing again her alternative perpetrator theory.  The Trial Court did not believe a continuance was necessary for an expert to review the Lab's testing or the chemist's testimony.

The legal standard for reviewing a ruling on an RCr 9.04 motion is as follows:

> When ruling on a motion for a continuance the trial court must consider the facts of each case, especially the length of the delay; previous continuances; inconvenience to the litigants, witnesses, counsel and the court; whether the delay is purposeful or is caused by the accused; the complexity of the case; and whether denying the continuance will lead to identifiable prejudice. *Edmonds v. Commonwealth*, 189 S.W.3d 558, 564 (Ky. 2006).  On appeal, a trial court's decision to grant or deny a request for a continuance is reviewed under the abuse of discretion standard. *Id.*; *Wells v. Salyer*, 452 S.W.2d 392, 395-96 (Ky. 1970) ("An application for a continuance is addressed to the sound discretion of the trial court and unless the discretion has been abused the action of that court will not be disturbed.").  "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Commonwealth v. English*, 993 S.W.2d 941, 945 (Ky. 1999).

*Slone v. Commonwealth*, 382 S.W.3d 851, 855-56 (Ky. 2012).

Here, the Trial Court found: the length of the delay would be substantial due to the current docket being full for the next 12 months; there had been a previous continuance but not at Bingham's request; there would be inconvenience to at least one of the Commonwealth's witness who now resides out-of-state; the delay was not purposeful, and neither caused by the accused nor the Commonwealth's Attorney; Bingham had competent counsel for two years and she needed to keep her current attorneys; the case was not complex; and there would be some identifiable prejudice to both parties, especially with the length of delay that a continuance would create.

Bingham now argues that the Trial Court acted arbitrarily when making these findings. Bingham proffers her belief that her case was complex; it involved multiple experts; and denying her a continuance "cut off" a potential defense stemming from the Lab's testing. We can adduce no abuse of discretion in the Trial Court's handling of this continuance request. The Trial Court conducted a full evidentiary hearing on the motion and conducted *ex parte* hearings to understand Bingham's defense fully. The Lab's test results and the chemist's testimony were readily understandable and could have been utilized by Bingham to support an alternative perpetrator defense. The delay from a continuance would be substantial. And the Trial Court made balanced findings on all of the relevant factors based on record evidence. None of the findings singularly or collectively

amounts to an abuse of discretion. Accordingly, the Trial Court made a decision within its sound discretion to refrain from continuing the case. *Williams v. Commonwealth*, 644 S.W.2d 335, 336-37 (Ky. 1982) ("The granting of a continuance is in the sound discretion of a trial judge, and unless from a review of the whole record it appears that the trial judge has abused that discretion, this court will not disturb the findings of the court."). No reversible error occurred on this issue.

**IV.     Did the Trial Court err by introducing a photograph of Bingham's car?**

Bingham next claims reversible error occurred because the Commonwealth introduced a photograph purporting to show the backseat of Bingham's vehicle. The backseat had one car seat and no booster seat, and the car appeared cluttered with items stacked on and about the car seat and backseat. Bingham claims the photograph lacked foundation pursuant to KRE[7] 901, and it was irrelevant and prejudicial, KRE 401-404. Bingham admits her KRE 401-404 arguments are not preserved and requests the RCr 10.26 relief under palpable error review. The Commonwealth responds that the Trial Court properly admitted the photograph or, alternatively, that it committed only harmless error.

---

[7] Kentucky Rules of Evidence.

-22-

Bingham testified that she had a booster seat and a car seat for the children. However, the booster seat would sometimes be located in Bingham's grandmother's car. The Commonwealth showed Bingham the photo at issue and asked Bingham if it was an accurate representation of the backseat of her vehicle on the day of the house fire. Bingham did not know. She explained that she and others kept a lot of items in the car, and it was possible that the children's father threw items on top of the car seat. The Commonwealth then recalled one of its police officers to identify the photograph. The sergeant stated that he did not take the photograph, but he did state the photograph was a fair and accurate depiction of how the backseat looked on April 7, 2020. The Trial Court permitted the exhibit to be admitted over Bingham's renewed objection.

Evidentiary foundation issues are reviewed for an abuse of discretion. *Ross v. Commonwealth*, 455 S.W.3d 899, 912 (Ky. 2015). "The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims." KRE 901(a). Here, the sergeant laid the proper foundation and identification, even though he did not take the photograph. *See, e.g.*, *Eldred v. Commonwealth*, 906 S.W.2d 694, 704 (Ky. 1994) ("[T]he detective specifically testified as to each of the photos that they truly and accurately depicted the scene when the automobile was discovered, which supplies the necessary foundation."),

*abrogated on other grounds by Commonwealth v. Barroso*, 122 S.W.3d 554 (Ky. 2003). No abuse of discretion occurred on the foundation issue.

Furthermore, we are not persuaded that any error, let alone an error that was palpable, occurred under KRE 401-404 by admitting this photograph. The factual matter that Bingham did not take her children with her in her car was uncontested. The photograph is relevant to show that she had the means of taking the kids with her to get the Lortab, even if she, like many parents, would have had to move booster seats from one vehicle to another and reorganize the numerous items in the backseat. KRE 401-402. There was no undue prejudice, confusion of the issues, or any of the other KRE 403 factors that "substantially outweighed" the relevance of the evidence. And we cannot fairly state that having a cluttered backseat – a common occurrence among many parents of young children – is evidence of other "crimes, wrongs, or acts" per KRE 404(b). There being no error with the introduction of the evidence, there could be no palpable error. *See Commonwealth v. Jones*, 283 S.W.3d 665, 668 (Ky. 2009).

Moreover, even if the issues had been preserved and constituted error, the errors would have been harmless, as there was "no substantial likelihood . . . that it affected the verdict." *Burdette v. Commonwealth*, 664 S.W.3d 605, 621 (Ky. 2023) (citing *Shouse v. Commonwealth*, 481 S.W.3d 480, 491 (Ky. 2015)). Bingham admitted she left the children alone in an inherently dangerous residence.

This photograph of a messy backseat did not change or confuse the underlying fact issue regarding Reckless Homicide. Additionally, being an unpreserved allegation of error, any error by introducing this photograph did not rise to the level of palpable error, which would be an error that "so seriously affected the fairness, integrity, or public reputation of the proceeding" and affected Bingham's substantial rights. As stated above, numerous parents of small children have cluttered backseats in their cars (as do numerous non-parents), and, more importantly, the determinative issue here was whether Bingham acted recklessly when she left her children alone and helpless in an inherently unsafe residence while she went to obtain an unprescribed drug. RCr 10.26, *Jones*, *supra*. Accordingly, we affirm the Trial Court on this issue.

## V. Did the Trial Court err by not granting probation or reducing the sentence?

Finally, Bingham argues that the Trial Court abused its discretion by declining to grant her probation or a reduced sentence. "The granting of parole is wholly at the discretion of the Parole Board and the granting of probation is wholly within the discretion of the trial court." *Burke v. Commonwealth*, 506 S.W.3d 307, 314 (Ky. 2016) (citing *Stewart v. Commonwealth*, 153 S.W.3d 789 (Ky. 2005), and *Ridley v. Commonwealth*, 287 S.W.2d 156 (Ky. 1956)). "This state has a well settled rule that unless there exists some constitutional or statutory limitation, the sentencing power of a trial court is discretionary." *Wilson v. Commonwealth*, 601

S.W.2d 280, 286 (Ky. 1980). A Trial Court abuses its discretion when it makes a decision that is arbitrary, unreasonable, unfair, or unsupported by sound legal principles. *Miller v. Eldridge*, 146 S.W.3d 909, 914-15 (Ky. 2004).

The facts here show that two small children perished when left alone and helpless while Bingham drove away from the residence to obtain an opioid drug for which she had no prescription. We have reviewed the proceedings and the record herein and find the Trial Court did not abuse its discretion by imposing the sentence recommended by the jury and by refusing to grant probation or reduce Bingham's sentence. Accordingly, we affirm on this issue.

## CONCLUSION

In the middle of the day, Bingham chose to leave her helpless children alone inside a trailer that she knew had dangerous electrical problems while she drove to another neighborhood to obtain drugs. Her children died in a house fire while she was gone. The judgment and sentence for two counts of Reckless Homicide are AFFIRMED for the reasons stated above.

ACREE, JUDGE, CONCURS.

COMBS, JUDGE, CONCURS IN RESULT ONLY.

BRIEFS FOR APPELLANT:                    BRIEF FOR APPELLEE:

Adam Meyer                               Daniel Cameron
Frankfort, Kentucky                      Attorney General of Kentucky

                                         Courtney J. Hightower
                                         Assistant Attorney General
                                         Frankfort, Kentucky